**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 30 2014, 9:42 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.G., minor child, and K.G., the mother, and S.L., the father,[1]<br><br>K.G.,<br><br>    Appellant-Respondent,<br><br>        vs.<br><br>INDIANA DEPARTMENT OF CHILD SERVICES,<br><br>    Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 79A02-1403-JT-194<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Faith A. Graham, Judge
Cause No. 79D03-1308-JT-52

**September 30, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

---

[1] We note that, although S.L. filed a notice of appeal, he later filed a motion to dismiss that appeal; therefore, he does not participate in this appeal. However, "[u]nder Indiana Appellate Rule 17(A), '[a] party of record in the trial court or Administrative Agency shall be a party on appeal.'" *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.*, 844 N.E.2d 157, 162 (Ind. Ct. App. 2006) (quoting Ind. Appellate Rule 17(A)), *trans. denied*.

K.G. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, S.G., arguing that the evidence presented was insufficient to support the termination of her parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY[2]

On July 12, 2012, Tippecanoe County Department of Child Services ("DCS") received a report alleging lack of supervision and substance abuse by Mother in regards to S.G., who was five years old at the time. Upon investigation, DCS discovered S.G. was home alone, wandering around outside in the apartment complex, and wearing a winter jacket and soiled underwear. Mother later returned to the home intoxicated and admitted that she left S.G. home alone for over an hour while she went to a friend's house where she consumed alcohol. Mother was arrested for neglect of a dependent, and DCS removed S.G. from Mother's care. During the investigation of the report, it was also learned that a similar report of S.G. being alone outside in the apartment complex was unsubstantiated in June 2012 after Mother was found in the apartment asleep. It was also discovered that, in June 2010, S.G. fell out of a third-story window while in Mother's care, and Mother was unaware of the incident until a maintenance man knocked on her door and told her.

---

[2] The record on appeal in this case was prepared pursuant to the Indiana Supreme Court's "Order For the Indiana Court Reporting Pilot Project By Using Professional Transcription Experts On Appeal[,]" issued on November 8, 2012, and effective on November 1, 2012. *See In re Pilot Project For Expedited Transcripts In the Preparation of the Record and Briefing on Appeal*, 977 N.E.2d 1010 (Ind. 2012). We are grateful for the ongoing cooperation of the Honorable Faith A. Graham of Tippecanoe Superior Court, appellate counsel, and the Office of the Indiana Attorney General in the execution of this pilot project.

On July 13, 2012, DCS filed a child in need of services ("CHINS") petition. Following a fact-finding hearing, the juvenile court adjudicated S.G. as a CHINS, and a dispositional order and parental participation decree were entered. S.G. was to remain in foster care, and Mother was ordered to: participate in substance abuse assessment and follow all recommendations; participate in a clinical interview and assessment and follow all recommendations; participate in home-based case management services; visit with S.G. as recommended by the treatment team; remain drug and alcohol free and submit to random drug screens; obtain suitable housing and stable employment; participate in all hearings, case conferences, visitations and appointments; cooperate with efforts to establish paternity as to S.G.; and comply with all standard terms of the parental participation decree.

At the time the CHINS petition was filed, paternity had not been established. DCS contacted S.L. ("Father"),[3] who wanted no contact with either Mother or S.G. A petition to establish paternity was filed, and paternity was established on January 17, 2013 based on genetic testing. Father was married to another woman at all pertinent times of this case, and consistently expressed an unwillingness to provide care for S.G. When contacted by DCS at the beginning of the CHINS case, Father had no desire to have any relationship with either Mother or S.G. He again repeated this desire on August 30 and September 24, 2012 and on July 31 and August 1, 2013. On September 20, 2013, Father signed a consent to voluntarily terminate his parental rights. However, at the October 23, 2013 termination hearing, before the juvenile court accepted Father's voluntary termination, he decided he

---

[3] Although Father is not appealing, Mother's argument includes contentions that Father is both willing and able to parent S.G. We, therefore, include facts pertaining to Father to the extent they are relevant to Mother's argument.

was willing to seek custody of S.G. DCS offered services to Father, but he failed to respond and refused to complete a drug screen.

Mother has a criminal history that dates back to August 2000 when she had a withheld judgment for visiting a common nuisance, possession of marijuana, and possession of paraphernalia. Since then, she has been convicted of seven misdemeanors, including, check deception, resisting law enforcement, criminal mischief, battery on a law enforcement officer, and operating while intoxicated, and two Class D felonies, including battery by body waste and neglect of a dependent, which initiated the underlying CHINS case. During the time the CHINS case was pending, Mother was incarcerated three times: (1) from July 2012 to late August 2012 for the neglect of a dependent charge; (2) in May 2013 for violating her probation; and (3) from July 2013 to September 2013 for a probation violation.

Mother has an extensive substance abuse history. She began drinking alcohol at the age of eleven and continued into adulthood. Mother also began using marijuana at the age of eleven and eventually using it on a daily basis until she was thirty years old. She also admitted to having used LSD, ecstasy, methamphetamine, cocaine, and Adderall. Mother's only reported periods of sobriety prior to the CHINS proceedings were during three months of incarceration and nine months of pregnancy. Following S.G.'s removal from Mother's care in July 2012, Mother tested positive for both alcohol and synthetic cannabinoids. During the CHINS proceedings, she tested positive for alcohol in September 2012, for marijuana in April, 2013, and for synthetic cannabinoids in July 2013. Mother also failed a drug screen for the probation department in March 2013 and provided diluted urine

4

screens on December 12 and 20, 2012, April 15, 2013, and on July 16, 2013.  She also refused to submit to a hair follicle drug screen on July 16, 2012.

At the beginning of the CHINS proceedings, Mother consistently attended services offered by DCS.  By December 2012, Mother had completed court-ordered assessments and was participating in substance abuse treatment, individual therapy, and home-based case management.  Her visitations with S.G. were semi-supervised in her home and in the community.  On February 27, 2013, Mother began trial home visitation.  By April 22, 2013, trial home visitation had failed.  Mother failed to attend substance abuse meetings and tested positive for alcohol and marijuana.  She left S.G. with unapproved caregivers, including her maternal grandfather, who was an alcoholic, and other relatives who had active warrants.  Mother also had missed individual therapy and became less compliant with home-based service providers.  She also failed to make sure S.G. attended group therapy and missed a parent-teacher conference and S.G.'s doctor appointment.  Mother's nephew, who was an active runaway with an extensive juvenile history, and his girlfriend were staying at Mother's home without DCS approval.  S.G.'s school reported that S.G. appeared dirty and unkempt and had reverted to negative behaviors.  All visitations were suspended in May 2013 due to an active warrant for Mother's arrest for a probation violation.  Mother's behavior became erratic with service providers, and she yelled and cursed at them regarding scheduling deadlines for visitations with S.G.  She forfeited visitations during the month of July 2013 due to her failure to provide her work schedule in a timely manner.  Later in the month, Mother cancelled visitations, case management meetings, and therapy services.

5

At the time the CHINS proceedings began, Mother was unemployed and living with her grandfather, who has an extensive criminal history related to his alcohol use and who drank on a daily basis. Mother obtained employment working third shift at Taco Bell in September or October 2012. She was able to obtain independent housing in February 2013. In July 2013, Mother was terminated from her job at Taco Bell for walking out in the middle of her shift. She was on the verge of eviction from May 2013 until July 2013 when she was incarcerated. Following her release from incarceration in September 2013, Mother moved back in with her grandfather.

On August 19, 2013, DCS filed a petition to terminate Mother's parental rights to S.G. Evidentiary hearings were held on October 23, December 13, and December 16, 2013. At the hearings, DCS family case manager ("FCM") Tracy Williams testified that she felt it was in "[S.G.'s] best interest to have both parents' rights terminated." (A/V Rec. 12/13/2013; 03:05:14-03:05:18). S.G.'s play therapist stated that a permanent resolution for S.G. other than reunification with Mother was in the child's best interest. Mother's home-based service provider also stated that Mother was not ready to have S.G. back in her care. Mother's therapist testified that she had concerns about whether Mother would be able to maintain her sobriety. The court appointed special advocate ("CASA") Diana Vice testified that her recommendation for S.G. would be reunification with Father, and her second recommendation would be for S.G. to stay with her foster parents. (A/V Rec. 12/16/2013; 04:30:12-04:39:22). CASA Vice also stated that she believed S.G. was happy with her foster parents and that placement with them would be a good option. (A/V Rec. 12/16/2013; 04:54:16-04:54:20). FCM Williams testified that, "[S.G.] is incredibly bonded to the foster family and the children in the foster family. At this point, even

6

continuing to delay her permanency is impacting her well-being." (A/V Rec. 12/13/2013; 03:04:36-03:04:48).

At the conclusion of the evidentiary hearings, the juvenile court took the case under advisement. On March 17, 2014, the juvenile court issued its order terminating the parental relationship of both Mother and Father to S.G. Both Mother and Father filed an appeal to the juvenile court's order. However, Father filed a motion to dismiss his appeal, which was granted by this court on June 16, 2014. We, therefore, proceed solely with Mother's appeal.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

Here, in terminating Mother's parental rights to S.G., the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings

7

support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

8

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

Mother argues that DCS failed to prove the required elements for termination by sufficient evidence. Mother specifically alleges that DCS failed to present sufficient evidence to prove that the conditions which resulted in S.G. being removed will not be remedied or that the continuation of the parent-child relationship poses a threat to S.G. She also asserts that insufficient evidence was presented to prove that it was in the best interests of the child that her parental rights be terminated.[4] Throughout her arguments, Mother asserts that "[F]ather's current willingness and ability to parent [S.G.] renders the DCS evidence insufficient as to [remedy] and 'threat.'" *Appellant's Br*. at 6, 11. However, Father's motion to dismiss his appeal, and this court's grant of dismissal with prejudice, renders this portion of Mother's argument moot.[5]

We first address Mother's contention that DCS did not prove by clear and convincing evidence that the conditions that resulted in S.G.'s removal would not be

---

[4] Although Mother mentions the juvenile court's conclusions regarding that there was a satisfactory plan for the care and treatment of S.G., she makes no actual argument challenging the court's conclusions. Therefore, to the extent that she is challenging the sufficiency of the conclusions, we conclude that she has waived these arguments. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 n.4 (Ind. Ct. App. 2013).

[5] Litigants are generally barred from asserting the rights or legal interests of others in order to obtain relief from injury themselves. *In re S.L.*, 599 N.E.2d 227, 229 (Ind. Ct. App. 1992).

remedied. When a juvenile court decides the issue of whether the conditions that led to a child's removal would be remedied, the juvenile court must assess a parent's fitness to care for his or her child at the time of the termination hearing. *In re D.D.*, 804 N.E.2d at 266. Additionally, a juvenile court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012), *trans. denied*. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id*. Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. *Id*. Parental rights may be terminated when parties are unwilling or unable to meet their parental responsibilities. *In re D.D.*, 804 N.E.2d at 265.

The evidence showed that Mother's history with DCS dates back to substantiated reports to the Georgia Division of Family and Children Services of "inadequate supervision with alcohol" and "inadequate supervision with alcohol and prescription meds" in 2002 and 2003 concerning Mother's oldest daughter. *Appellant's App*. at 49. In July of 2012, DCS received a similar report, concerning S.G. being alone outside in the apartment complex after being left alone by Mother while she went to consume alcohol at a friend's house. There was also a similar report in June 2012 of S.G. alone outside in the apartment complex, but that report was unsubstantiated when Mother was located asleep in the apartment. After the July 2012 report, S.G. was removed from Mother's care and CHINS proceedings were initiated. Mother has a significant criminal record and a long history of substance abuse, and both issues continued through the duration of the CHINS

10

proceedings. She tested positive for alcohol, marijuana, and spice numerous times during the CHINS proceedings, and her most recent positive drug screen was in July 2013. Mother's therapist testified at the termination hearing that she had concerns about whether Mother would be able to maintain her sobriety. Additionally, while the CHINS proceedings were pending, Mother was convicted of D felony neglect of a dependent, which stemmed from the incident that resulted in S.G. being removed, and was incarcerated from July 2012 to late August 2012 for the neglect of a dependent charge, in May 2013 for violating her probation, and from July 2013 to September 2013 for a probation violation.

In April 2013, trial home visitations were stopped because Mother failed to attend substance abuse meetings and tested positive for alcohol and marijuana. She left S.G. with unapproved caregivers, including her grandfather, who was an alcoholic, and other relatives that had active warrants. She also had missed individual therapy and became less compliant with home-based service providers. All visitations were suspended in May 2013 due to an active warrant for Mother's arrest for a probation violation. Mother's behavior became erratic with service providers, and she yelled and cursed at them regarding scheduling deadlines for visitations with S.G. She forfeited visitations during the month of July 2013 due to her failure to provide her work schedule in a timely manner, and later that month, she cancelled visitations, case management meetings, and therapy services.

Further, the evidence showed that Mother was terminated from her employment in July 2013 because she walked out in the middle of her shift. She was on the verge of eviction from her apartment from May to July 2013, when she became incarcerated. Since her release from incarceration, Mother has not maintained independent housing, but was instead living with her grandfather, who has a history of alcohol abuse.

11

Mother requests this court to consider her bipolar diagnosis, her lack of treatment for the condition during the CHINS proceedings, and her intention to seek treatment in the future. However, the juvenile court did consider Mother's diagnosis in its termination order and found that Mother received a recommendation for a psychiatric evaluation for potential medication, but failed to follow through with the recommendation. *Appellant's App.* at 49. Nothing in the record explains why Mother failed to seek treatment for her bipolar disorder prior to the filing of the termination petition. Mother's other contentions are merely requests for this court to reweigh the evidence, which we cannot do. *In re D.D.*, 804 N.E.2d at 265. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal of S.G. from Mother's care would not be remedied.

Mother next contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of S.G. At the outset, we observe that Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of S.G. from Mother's care would not be remedied, we need not address Mother's argument on this element.

Mother's next argument is that insufficient evidence was presented to prove that termination was in the best interests of the child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924

12

N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied).* The trial court need not wait until the child is irreversibly harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id.* (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

The record is clear that S.G. needed stability and a sense of permanency in order to foster her physical, mental, and social growth. At the time of the termination hearing, S.G. had been removed from Mother's care and had been in the care of the foster parents for approximately seventeen months. During that time, Mother continued to abuse drugs, was incarcerated three different times, and failed to participate in services. Mother points to the bond between her and S.G., which is not in dispute. However, despite this bond and Mother's stated desire to be reunified with S.G., Mother failed to benefit from the services offered to her and to establish a safe and stable home environment for S.G. S.G. needs permanency, and the evidence showed that Mother was still not equipped to provide this needed stability and permanency. FCM Williams, S.G.'s therapist, and Mother's home-based service provider all recommended that termination was in S.G.'s best interest.

13

In support of her argument, Mother points to the testimony by CASA Vice that breaking the bond between Mother and S.G. would be devastating to S.G. However, although CASA Vice did state this, she also stated that her first recommended option for S.G.'s placement was with Father, not Mother and the second option was foster placement. In fact, CASA Vice had recommended termination of Mother's parental rights in October 2013. *Appellant's App*. at 51. The CASA also stated that S.G. was happy with her foster family and placement there would be a good option. Based on the above, we conclude that sufficient evidence was presented to prove that termination of Mother's parental rights was in the best interests of S.G.

We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to S.G. was clearly erroneous. Further, Mother's arguments are merely a request for us to reweigh the evidence and judge the credibility of the witnesses, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. We therefore affirm the juvenile court's judgment.

Affirmed.

MAY, J., and BRADFORD, J., concur.

14