**HOOSIER OUTDOOR ADVERTISING CORPORATION, Appellant–Intervenor,**

and

**Monroe County, Indiana, Monroe County Board of Zoning Appeals, Non–Party on Appeal/Respondent,**

v.

**RBL MANAGEMENT, INC., Appellee–Petitioner.**

No. 53A01–0508–CV–368.

Court of Appeals of Indiana.

March 21, 2006.

Rory O'Bryan, Keith Beall, Harrison & Moberly, LLP, Carmel, Richard L. Mostak, Lowell, John H. Shean, Bloomington, for Appellant.

Robert C. Price, Mary M. Runnells, Price & Runnells, Thomas A. Berry, Debra Davis, Berry & Domer, Bloomington, for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Hoosier Outdoor Advertising Corporation ("Hoosier") appeals the trial court's judgment reversing decisions of the Monroe County Board of Zoning Appeals ("BZA"), which had granted Hoosier permission to erect and display certain billboards while denying similar permission to RBL Management, Inc. ("RBL"). We reverse.

### Issue

The restated issue before us is whether the trial court properly reversed the BZA's decisions.

### Facts

The facts most favorable to the BZA's rulings are that since the 1930s, certain property owned by the Stuart family on State Road Business 37, north of Bloomington, had been used as a location for off-premises signs, i.e. billboards. In 1989, the Stuart family entered into a lease with Hoosier for use of portions of the property as off-premises sign locations. The lease provided in part:

It is agreed that all structures, equipment, materials, and fixtures shall remain the property of lessee and lessee is granted reasonable time to remove the sign structure(s) after the termination of this agreement.

\* \* \* \* \*

This agreement shall be binding upon the heirs, executors, personal representatives, successors and assigns for the parties hereto . . . .

\* \* \* \* \*

Hoosier will remove all posts & concrete when signs are removed.

App. pp. 32–34.

In 1996, Monroe County enacted a new zoning ordinance (the Monroe County Zoning Ordinance or "MCZO") governing unincorporated areas of the county that curtailed the use of off-premises signs. Specifically, the new ordinance generally prohibited all off-premises signs, with two exceptions. First, it allowed the continued nonconforming use of off-premises signs at their current locations. Second, it allowed the relocation of off-premises signs from their current location to a location within a specified zoning district, namely the LB, GB, LI, or HI districts. The Stuart property was not located in one of these districts.

In 1998, after the written lease expired, Hoosier agreed to continue leasing the property on a year-to-year basis, with annual rent of $6,495 due each September 15. In 2003, the Stuart family entered negotiations to sell the property to RBL. Hoosier was informed that its lease would not be renewed after September 15, 2003. However, Hoosier continued using the property after that date. In December 2003, Hoosier paid the Stuart family $2,165, which represented pro rata payment for four months of the annual rent that was due on September 15, 2003.

RBL was aware that there was a lease between the Stuarts and Hoosier for the sign locations, but it never obtained or read a copy of the lease. RBL expected to use the Stuart property for the placement

of off-premises signs. On January 12, 2004, the sale of the property from the Stuarts to RBL closed. Hoosier learned of the sale in February 2004. Hoosier completely removed its sign/billboard structures, at RBL's insistence, by September 24, 2004.

Meanwhile, in May 2004, RBL applied to the Monroe County Planning Commission ("the Commission") for permits to replace the existing Hoosier sign/billboard structures with another company's entirely new structures. Also in May 2004, Hoosier applied to the Commission for permission to relocate their sign/billboard structures to properties located in the LB, GB, LI, and/or HI zoning districts. Under the MCZO, at most only either Hoosier's or RBL's application could be granted because there could be no increase in the total number of off-premises signs in unincorporated Monroe County.

On August 26, 2004, the Commission denied Hoosier's application to relocate its signs. On October 26, 2004, the Commission approved RBL's application to place new sign/billboard structures on the former Stuart property. Hoosier appealed both of these determinations to the BZA. On December 1, 2004, the BZA reversed the Commission's decisions in two decisions of its own, concluding that Hoosier was entitled to relocate its sign/billboard structures and that RBL could not erect new sign/billboard structures on its property. RBL filed a petition for certiorari with the trial court, identifying the BZA and Monroe County as respondents; Hoosier was permitted to intervene in the action. On July 15, 2005, the trial court reversed the BZA and effectively reinstated the Commission's decisions. Hoosier now appeals.

## Analysis

■ At the outset, we address a procedural issue that RBL has raised through-out its brief, and that is the BZA's decision not to participate actively in this appeal. RBL contends that this decision means the BZA now accepts that its original ruling was incorrect and, therefore, we should not employ our usual deference to agency decisionmaking. We have denied RBL's motion to supplement the trial court record to include the minutes of a BZA meeting, postdating the trial court's ruling in this case, where the BZA voted not to participate in this appeal. We have chosen not to strike those portions of RBL's brief that refer to the BZA not participating in this appeal because that fact is apparent from the face of the docket in this case. The BZA's non-participation has no relevance to our standard of review, however, contrary to RBL's argument.

■ First, we note the general rule that on appeal we must consider only those matters contained in the record below, unless extraneous material is needed in order to determine whether an appeal is moot. *In re Commitment of J.B.*, 766 N.E.2d 795, 798 (Ind.Ct.App.2002). This court has held that where a party is permitted to intervene in a lawsuit under Indiana Trial Rule 24, that party may appeal a decision adverse to its interests even if the original party or parties decide to forego the pursuit of an appeal; the case is not moot. *See City of New Haven v. Chemical Waste Mgmt. of Indiana*, 685 N.E.2d 97, 102 (Ind.Ct.App.1997), *trans. dismissed.* "Generally, one who has been allowed to intervene in an action may appeal from subsequent orders in the action." *Id.* at 101. "An intervenor is treated as if it was an original party and has equal standing with the parties." *Mercantile Nat'l Bank of Indiana v. Teamsters Union Local No. 142 Pension Fund*, 668 N.E.2d 1269, 1271 (Ind.Ct.App.1996). There is no question in this case that Hoosier properly intervened in the certiorari action and no question

that the trial court's decision was adverse to its interests. As a proper intervenor, Hoosier is entitled to precisely the same standard of review in this case as if the BZA itself had made an appearance on appeal.

■ Second, the BZA's failure to participate actively in this appeal does not mean it is not a party on appeal. Under Indiana Appellate Rule 17(A), "A party of record in the trial court or Administrative Agency shall be a party on appeal." "The rule operates of its own force to make all parties in the trial court parties on appeal, whether such parties participate actively or not." *State v. Nixon,* 270 Ind. 192, 194, 384 N.E.2d 152, 153 (1979) (addressing substantially identically-worded predecessor to current Appellate Rule 17(A)); *see also Nance v. Miami Sand & Gravel, LLC,* 825 N.E.2d 826, 833 n. 3 (Ind.Ct.App. 2005), *trans. denied.* Thus, regardless of the BZA's non-participation in this appeal, we review the trial court's reversal of its decisions by applying the same standard of review as if it has participated.

■ Before turning to the merits, we also pause to comment on the tone of RBL's brief, which we find in multiple places to be argumentative and disrespectful to opposing counsel. RBL cites to *In re Guardianship of Hickman,* 805 N.E.2d 808 (Ind.Ct.App.2004), *trans. denied,* and uses the opportunity to cast Hoosier's current president in an irrelevant negative light by stating, "*Hickman* is worth reading for a number of reasons, one of which is that Hoosier's current president Leo Hickman became embroiled in a guardianship dispute with his siblings over control of his mother's estate."[1] Appellee's Br. p. 27. Repeatedly, RBL refers to Hoosier's

litigation attempting to gain permission to relocate its signs to be a "scheme," which obviously carries a negative connotation of Hoosier being motivated by some nefarious purpose other than pursuing its legitimate interests. *See id.* at 6, 7, 14, 16, 43, 44, 45. In another passage, RBL clearly implies that Hoosier "possessed an ill-intent" and "concoct[ed] some cockamamie theory under which the signs could be replaced or moved . . . ." *Id.* at 32. Elsewhere, Hoosier's position is described as "oddly obtuse if not foolhardy . . . ." *Id.* at 34. RBL also accuses Hoosier of playing a "shell game" and making "nonsensical" arguments. *Id.* at 39. Such vitriol is inappropriate and not appreciated by this court, nor does it constitute effective appellate advocacy. *See Wright v. State,* 772 N.E.2d 449, 453 n. 1 (Ind.Ct.App.2002). The use of impertinent, intemperate, scandalous, or vituperative language in an appellate brief opens it to being stricken by this court. *See id.* We have chosen not to do so here, but admonish counsel to adopt a level of professionalism in any subsequent dealings with this court.

■ "When reviewing a decision of a zoning board, we are bound by the same standard of review as the certiorari court." *S & S Enterprises, Inc. v. Marion County Bd. of Zoning Appeals,* 788 N.E.2d 485, 489 (Ind.Ct.App.2003), *trans. denied.* Indiana Code Section 4–21.5–5–14 establishes the scope of judicial review of an administrative decision. *Id.* at 490. Section 4–21.5–5–14(d) provides that a court may grant relief only if the agency action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional

1. The author of this opinion is well aware of the Hickman family's legal disputes. *See In re Guardianship of Hickman,* 811 N.E.2d 843 (Ind.Ct.App.2004), *trans. denied.* Additional-

ly, one of the concurring judges authored the *Hickman* opinion RBL cites. Those disputes have no relevance at all to this case.

right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Section 4–21.5–5–14(a) places the burden of demonstrating the invalidity of agency action on the party asserting the invalidity.

■■■■ In reviewing an administrative decision, a trial court may not try the facts de novo or substitute its own judgment for that of the agency. *S & S Enterprises,* 788 N.E.2d at 490. "Neither the trial court nor the appellate court may reweigh the evidence or reassess the credibility of witnesses." *Id.* Reviewing courts must accept the facts as found by the zoning board. *Id.* There do not appear to be any genuinely disputed relevant facts in this case. Instead, we are presented with legal issues concerning the applicability of the MCZO to those facts.

■■■■ Generally, we review questions of law decided by an agency de novo. *Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806, 809 (Ind.2004). However, an agency's construction of its own ordinance is entitled to deference. *See Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n,* 819 N.E.2d 55, 66 (Ind.2004). The ordinary rules of statutory construction apply in interpreting the language of a zoning ordinance. *Id.* at 65. Under those rules, the express language of the ordinance controls our ·interpretation and our goal is to determine, give effect to, and implement the intent of the enacting

body. *See Shaffer v. State,* 795 N.E.2d 1072, 1076 (Ind.Ct.App.2003). When an ordinance is subject to different interpretations, the interpretation chosen by the administrative agency charged with the duty of enforcing the ordinance is entitled to great weight, unless that interpretation is inconsistent with the ordinance itself. *See id.* If a court is faced with two reasonable interpretations of an ordinance, one of which is supplied by an administrative agency charged with enforcing the ordinance, the court should defer to the agency. *See id.* Once a court determines that an administrative agency's interpretation is reasonable, it should end its analysis and not address the reasonableness of the other· party's interpretation. *Id.* at 1076–77. Terminating the analysis reinforces the policies of acknowledging the expertise of agencies empowered to interpret and enforce ordinances and increasing public reliance on agency interpretations. *Id.* at 1077.[2]

■■■■ There are a number of provisions in the MCZO that are relevant to our review. The central provision in this case is 807–5(C), which states in part:

(C) Off–Premise Sign Relocation. Off-premise sign relocations shall be permitted when a lawful nonconforming off-premise sign is removed for relocation to another zoning lot or to another location on the same zoning lot provided:

(1) The new location is within a LB, GB, LI, or HI district if the new location is on a different zoning lot;

---

2. RBL makes an argument in its brief regarding standard of review to the effect that we owe no deference to the BZA's rulings because approval or denial of a sign permit is a "ministerial" act that the Commission, and the BZA in reviewing the Commission's decision, had no discretion in considering. We see no reason to deviate from the well-settled standard of review derived from statutes and case law to the effect that we defer to agency factfinding and agency construction of ordinances it has been charged to administer and which are susceptible to interpretation, but do not defer otherwise to agency legal conclusions.

\* \* \* \* \*

(5) An application to relocate a sign shall be accompanied by a commitment to the removal of the sign from its existing location by both the owner of the property and of the sign. Each such conditional use approval shall include, as a condition of approval, a stipulation that the previous lawful nonconforming use at the previous location shall be deemed abandoned immediately upon relocation.

Hoosier asserts that its application to relocate its sign structures fully complied with this provision; RBL asserts the contrary.

One of RBL's arguments is that Hoosier had no "signs" that it could even petition to relocate under 807–5(C). Essentially, RBL claims that by the time Hoosier sought to relocate its structures, they were blank and no longer had any advertising on them and, therefore, they were not "signs" that Hoosier had any right to relocate. The BZA, throughout its findings and conclusions in ruling in favor of Hoosier, consistently described the Hoosier structures as "signs" or "sign structures." We conclude this is a reasonable interpretation of the MCZO and a reasonable application of that ordinance to the facts of this case.

The MCZO defines a "sign" as "Any device, fixture, placard, or *structure* that uses any color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public." MCZO § 801–2, "Definitions" (emphasis added). A "structure" is defined as "Any construction or any production or piece of work that is artificially made or built up or that is composed of parts joined together for occupancy, use, *or ornamentation*, whether installed on, above, or below the surface of a parcel of land (e.g., without limitation, buildings, roads, culverts, fences, etc.)."

*Id.* (emphasis added). An "off-premises sign" is "A sign which directs attention to a business, commodity, service or entertainment not conducted, sold or offered on the premises where the sign is located, or which business, commodity, service or entertainment forms only minor or incidental activity upon the premises where the sign is displayed." *Id.*

All of the evidence in this case indicates that the structures at issue were used strictly for off-premises advertising purposes at all times, i.e. they were billboards, up until sometime after RBL acquired the Stuart property and the advertising or "ornamentation" was removed. The lease between Hoosier and the Stuart family was expressly "for outdoor advertising purposes ...." App. p. 32. There is no evidence the structures have ever been used or were designed for any other purpose. We readily conclude the BZA did not err in describing the "structures" at issue here as "signs" or "sign structures" that, under the terms of the MCZO, Hoosier could petition to relocate. The construction of the ordinance urged by RBL and essentially adopted by the trial court would mean that at the precise moment any advertising is removed from a billboard structure, it ceases to be a "sign." Regardless of whether this might be a reasonable construction, the BZA's construction to the contrary likewise is reasonable, and we are required to accept the agency's reasonable construction of its own ordinance. *See Shaffer,* 795 N.E.2d at 1076–77.

The next question in this case is the meaning of the word "commitment" in 807–5(C)(5). RBL contends that this word refers to a zoning commitment, a term of art meaning a written and recorded commitment from the owner of the real property concerning future use of the property. Because RBL, as owner of the real estate

in question, had made no such express "commitment" regarding the removal of sign structures from its property, RBL argues that Hoosier failed to meet the first requirement for obtaining a permit for relocation of a sign under 807–5(C)(5). Hoosier contends, and the BZA concluded, that the "commitment" requirement of 807–5(C)(5) was fulfilled by three undisputed facts: the lease between Hoosier and the Stuart family required Hoosier to remove its signs at the termination of the lease, RBL had requested Hoosier to remove its signs, and Hoosier had in fact removed its signs as of September 2004.

Section 801–1 of the MCZO, entitled "Usage," states:

(A) Unless otherwise specifically provided, or unless clearly required by the context:

(1) words and phrases that are defined in this chapter shall be given their defined meaning when used in this ordinance;

(2) words and phrases that are not defined in this chapter but that are defined in other chapters of this ordinance, or in the Subdivision Control Ordinance, or in the Monroe County Code, shall be given their defined meanings when used in this chapter;

(3) technical words and phrases that are not defined in this chapter, or in other chapters of this ordinance, or in the Subdivision Control Ordinance, or in the Monroe County Code, but that have established and appropriate meanings in law shall be given such meanings when used in this chapter; and,

(4) words and phrases that are not otherwise specifically defined shall be taken in their plain, ordinary and usual sense.

"Commitment" is not given a defined meaning in the MCZO or elsewhere in Monroe County's ordinances. RBL argues, and the trial court agreed, that the word "commitment" was intended to be a technical word with an established legal meaning. Hoosier counters, and the BZA concluded, that "commitment" was intended to be used in its plain, ordinary, and usual sense.

Despite RBL's argument, we conclude that "commitment" is not a word that has a definite legal meaning. In fact, our supreme court recently observed, "Neither case law nor ... statute provides a definition of either 'condition' or 'commitment.' " *Story,* 819 N.E.2d at 63. The court did note that the parties in that case had agreed "that if a legislative body imposes the restriction [on the use of property], it is a condition, but if it is submitted by the property owner to induce rezoning, it is a commitment." *Id.* at 62. Ultimately, the court held that "conditions" attached to the approval of a planned unit development ("PUD") need not be recorded with the county recorder in order to be binding on a subsequent purchaser of the property so long as the conditions are available in the public record. *Id.* at 64. By contrast, "commitments" do have to be so recorded in order to be binding on future purchasers under the PUD statutes. *See id.* at 61 (citing Ind.Code § 36–7–4–615(C)). The *Story* court also made a note of pointing out that the local planning commission's labeling of the restrictions at issue did not by itself determine the legal character of the restrictions, i.e. whether they were "conditions" or "commitments." *See id.* at 63.

The statutes governing conditional use approvals, such as the one in this case, are similar to the PUD statutes with respect to "commitments" and "conditions." Indiana Code Section 36–7–4–921 provides:

(a) In the case of a petition or an application for a:

(1) special exception;

(2) special use;

(3) contingent use;

(4) conditional use; or

(5) variance;

from the terms of the zoning ordinance, a board of zoning appeals *may* permit or require the owner of a parcel of property to make a written commitment concerning the use or development of that parcel.

(b) The board of zoning appeals may:

(1) adopt rules governing the creation, form, recording, modification, enforcement, and termination of commitments; and

(2) adopt rules designating which specially affected persons and classes of specially affected persons are entitled to enforce commitments.

(c) Commitments shall be recorded in the office of the county recorder and take effect upon the approval of the exception, use, or variance. Unless modified or terminated by the board of zoning appeals, a commitment is binding on:

(1) the owner of the parcel;

(2) a subsequent owner of the parcel; and

(3) a person who acquires an interest in the parcel.

A commitment is binding on the owner of the parcel even if it is unrecorded. However, an unrecorded commitment is binding on a subsequent owner or other person acquiring an interest in the parcel only if that subsequent owner or other person has actual notice of the commitment. A commitment may be modified or terminated only by a decision of the board made at a public hearing after notice as provided by rule.

(d) By permitting or requiring commitments, a board of zoning appeals does not obligate itself to approve or deny any request.

(e) Conditions imposed on the granting of an exception, a use, or a variance are not subject to the rules applicable to commitments.

(f) This section does not affect the validity of any covenant, easement, equitable servitude, or other land use restriction created in accordance with law.

(Emphasis added). In keeping with this statute, section 821–17 of the MCZO states in part:

**Commitments**

(A) In the case of a petition for a variance, conditional use or special exception from the terms of the Zoning Ordinance, the Board *may* permit or require the owner of the affected parcel to make a *written* commitment concerning the use or development of the affected parcel.

\* \* \* \* \*

(C) Commitments shall be recorded in the Monroe County Recorder's Office and shall take effect upon the granting of the exception, use or variance. Unless modified or terminated by the Board, a commitment is binding on the owner of the parcel, each subsequent owner, and each other person acquiring an interest in the parcel. A commitment is binding on the owner of the parcel even if it is unrecorded; however, an unrecorded commitment is binding on a subsequent owner or other person acquiring an interest in the parcel only if that subsequent owner or other person had actual notice of the commitment. . . .

(Emphases added).

After reviewing *Story*, Indiana Code Section 36–7–4–921, and section 821–17 of the MCZO, we conclude that type of "commitment" referred to in section 807–5(C)(5) is different from the type of "commitment"

referred to in the case, statute, and section 821–17 of the MCZO. The type of zoning "commitment" discussed in *Story* and reflected by statute and section 821–17 of the MCZO are concerned with placing limitations or restrictions on the future use of property and providing notice of those limitations or restrictions to potential subsequent purchasers of the property. Here, the act of removing sign structures from a property lot is a one-time event; it is not a limitation or restriction on future use of the property nor anything that would have to be disclosed to a potential future purchaser of the property once the removal is complete. Those limitations and restrictions arise out of the MCZO itself governing where off-premises sign structures may be located. Any purchaser of the property would be deemed to have notice of the ordinance. *See Story*, 819 N.E.2d at 64. Additionally, section 807–5(C)(5) of the MCZO does not require the filing of a written commitment with the county recorder, unlike other sections of the MCZO regarding conditional use approvals that expressly do require such written and recorded commitments. *See* MCZO §§ 813–10(B)(18), 813–10(B)(19). Section 807–5(C)(5) simply requires "a commitment to the removal of the sign from its existing location by both the owner of the property and of the sign." We hold that the BZA's conclusion that "commitment" in this context should be given its ordinary, not technical, meaning is a reasonable one.

■ A "commitment" is defined as "The act or an instance of committing,"

which in turn is defined as "To do, perform, or perpetrate ... To make known the views of (oneself) on an issue ... To bind or obligate, as by a pledge." American Heritage College Dictionary pp. 280–81 (3d. ed.2000). Hoosier not only pledged to remove its sign structures from RBL's property, as embodied in the Stuart lease,[3] but it has actually done so, and at RBL's insistence. This goes beyond even mere "commitment" to remove the signs. The BZA concluded that this satisfied the "commitment" requirement of section 807–5(C)(5) of the MCZO. This is a reasonable conclusion that we will not disturb.

Next, we address the second sentence of section 807–5(C)(5): "Each such conditional use approval shall include, as a condition of approval, a stipulation that the previous lawful nonconforming use at the previous location shall be deemed abandoned immediately upon relocation." As opposed to the previous sentence, concerning a one-time removal of signs, this sentence does contemplate a future limitation on the use of the property from which the signs are removed. The essence of RBL's argument is that because it did not agree to abandon use of the property as a location for nonconforming off-premises sign use, it did not "stipulate" as required in order to grant Hoosier's petition to relocate its signs.

■ We begin by noting that our supreme court has discarded the notion that a property owner can only forfeit a non-

**3.** The written Stuart lease had expired several years before RBL acquired the property, but Hoosier and Stuart had renewed the lease on a year-to-year basis on several occasions, and Hoosier had paid the Stuart family for four additional months effective September 15, 2003. "In the absence of an agreement to the contrary, when a tenant holds over beyond the expiration of the lease and continues to make rental payments, and the lessor does not treat the tenant as a trespasser by evicting him, the parties are deemed to have continued the tenancy under the terms of the expired lease." *Houston v. Booher*, 647 N.E.2d 16, 19 (Ind.Ct.App.1995). Regardless of the precise date the Stuart–Hoosier lease officially expired, it firmly established that Hoosier owned the sign structures and gave Hoosier a "reasonable time" to remove them after the lease terminated.

conforming use of property by voluntary abandonment. *See Board of Zoning Appeals, Bloomington v. Leisz,* 702 N.E.2d 1026, 1031 n. 7 (Ind.1998).[4] Thus, there was no requirement here of evidence that RBL intended to abandon the nonconforming use of its property as a location for off-premises signs. *See id.* Abandonment of a nonconforming use can be established as a matter of law in other ways, including by amortization provisions that phase out a nonconforming use after a period of time or by a property owner's failure to register a nonconforming use with a local governmental agency. *See id.* at 1032–33.

■ The MCZO contains several provisions for the termination of nonconforming uses of property that do not require evidence that the property owner intended to abandon the nonconforming use. Of particular importance in this case is section 803–1(E), which states, "Where nonconforming use status applies to a structure and premises in combination, removal or destruction of the structure shall eliminate the nonconforming status of the land." The BZA concluded that this section directly applied in this case: once Hoosier completely removed its sign structures from RBL's property, the nonconforming status of the property ended and could not be revived by RBL. This strikes us as an eminently reasonable interpretation of section 803–1(E).

The trial court's conclusion and RBL's argument to the contrary again seems to be premised on the fact that Hoosier's sign structures no longer displayed advertising when they were removed and, therefore, they did not constitute a "nonconforming use" at that precise moment in time. We believe it is clear that the ordinance was intended to apply to large and obtrusive billboard sign structures, regardless of whether they actually displayed advertising at the current time. The structures themselves and their placement in certain locations are what the ordinance intends to regulate and not necessarily the fact that the structure may display commercial messages. We accept the BZA's construction of section 803–1(E).

■ Turning back to section 807–5(C)(5)'s requirement of a "stipulation," we conclude that this is simply a mechanism by which section 803–1(E)'s nonconforming use abandonment provision is enforced in a

---

4. *Leisz* concerned whether a zoning requirement that a property owner register a nonconforming use or else the use is forfeited constituted a "taking" under the Fifth and Fourteenth Amendments to the United States Constitution for which the government had to pay compensation. *Leisz,* 702 N.E.2d at 1027. Here, the trial court entered a finding that the BZA's decision was "contrary to a constitutional right, in that it deprives RBL of a vested property right without compensation." App. p. 20. As Hoosier notes, this is not an inverse condemnation action. Additionally, to the extent the trial court found and RBL repeatedly argues that it had a "vested property right" to place billboards on its property, that proposition is very doubtful. Our supreme court recently ruled that where an outdoor advertiser had received initial state permission to construct ten billboards but the local government subsequently amended its ordinance to make the billboards a nonconforming use of the property, the developer had no "vested interest" in the nonconforming use because it had not begun actual construction of the billboards when the new ordinance was enacted. *See Metropolitan Dev. Comm'n of Marion County v. Pinnacle Media, LLC,* 836 N.E.2d 422, 428–29 (Ind. 2005). This holding would seem to apply directly to RBL: it could have no "vested property right" in a nonconforming use of the Stuart property when it had not begun actual construction of any billboards when the BZA issued its ruling; in fact, it had not yet received any final agency approval to begin such construction because of the BZA appeal, unlike the developer in *Pinnacle.* Also, both the Stuart–Hoosier lease and the MCZO were in effect before RBL bought the property. We do observe that our supreme court is considering a rehearing petition in *Pinnacle.*

particular case. First, the "stipulation" referred to in section 807–5(C)(5) does not appear to be in the nature of a legal "stipulation" to which both parties must agree. The "stipulation" is made a part of the issuance of a conditional use approval, which approval is issued by the Commission or BZA, not either of the parties. Second, the "stipulation" is described as a "condition of approval," which generally denotes a restriction on use of property established by a local legislative body as opposed to a restriction agreed to by a property owner. *See Story,* 819 N.E.2d at 62. Finally, the "stipulation" must dictate that "the previous lawful nonconforming use at the previous location *shall be deemed abandoned* immediately upon relocation." "Deemed abandoned" clearly indicates that the abandonment is required as a matter of law, regardless of a party's agreement, in keeping with section 803–1(E) of the MCZO. Therefore, the BZA reasonably concluded that the fact RBL did not "stipulate" to abandoning the nonconforming use of its property was not a proper basis for denying Hoosier's application to relocate its signs. Such "stipulation" would occur as a matter of law, concurrent with approval of Hoosier's petition to relocate.

Thus, Hoosier met the requirements for obtaining permission to relocate its sign structures from RBL's property to other locations within Monroe County. This also necessarily means that RBL cannot construct new sign structures on its property. This result is entirely consistent with the evident overall purpose of the MCZO with respect to off-premises signs. Section 807–1 of the MCZO, "Purpose and Effect," states with respect to signs:

(A) These sign regulations are adopted under the zoning authority of Monroe County, Indiana for the purpose of:

(1) providing guidelines for the placing, number, size and general characteristics of all signs throughout the County Jurisdictional Area;

(2) encouraging the effective use of signs as a means of communication within the County Jurisdictional Area;

(3) maintaining and enhancing the aesthetic environment and the County's ability to attract sources of economic development and growth;

(4) improving pedestrian and traffic safety;

(5) minimizing the possible adverse effect of signs on nearby public and private property;

(6) enabling and promoting the fair and consistent enforcement of these sign restrictions; and,

(7) promoting the general purposes set forth in the Zoning Ordinance and the land use planning goals set forth in the Comprehensive Plan.

(B) The effect of this ordinance as more specifically set forth herein is:

(1) to establish a permit system to allow a variety of types of signs in commercial and industrial zones, and a limited variety of signs in other zones, subject to the standards and the permit procedures of this ordinance;

(2) to allow certain signs that are small, unobtrusive, and incidental to the principal use of the respective lots on which they are located, subject to the substantive requirements of this ordinance, but without a requirement for permits;

(3) to prohibit all signs not expressly permitted by this ordinance; and,

(4) to provide for the enforcement of the provisions of this ordinance.

Monroe County desires to limit the use of off-premises signs to the number currently in existence. It also wants to encourage the migration of existing nonconforming signs to limited areas of the county, namely the GB, LB, HI, and LI zoning districts.

Hoosier wants to move its signs into these districts and out of the RBL property, which is zoned RE.1 and BP. By contrast, allowing RBL, or any landowner, to construct entirely new signs outside of the GB, LB, HI, or LI zoning districts after the removal of old signs directly conflicts with the intent and purpose of the MCZO. If this were permitted, sign owners could never relocate their signs to the preferred districts over the objection of a landowner, and landowners could continually erect new signs in nonpreferred districts in perpetuity. It is clear that this is not what Monroe County wants.

The BZA's decisions to allow Hoosier to relocate its sign structures and deny RBL permission to erect new ones are reasonable and further the clear intent of the MCZO, while the trial court's decision does not. Additionally, we cannot conclude that the BZA's decisions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law; or unsupported by substantial evidence. Thus, we reverse the judgment of the trial court.

### Conclusion

We conclude that RBL has failed to meet its burden of demonstrating that the BZA's decisions were incorrect. The trial court erred in ordering reversal of those decisions. We reverse the trial court and direct that the BZA's original decisions be reinstated.

Reversed.

SHARPNACK, J., and RILEY, J., concur.