

**FILED**

Feb 14 2017, 9:59 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Robert W. Eherenman
Andrew L. Teel
Haller & Colvin
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES

The Rush County Area Board of
Zoning Appeals:

Grant M. Reeves
Barada Law Office
Rushville, Indiana

Intervening Respondent Appellees:

Stephen R. Snyder
Randall L. Morgan
Snyder Morgan, LLP
Syracuse, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Flat Rock Wind, LLC, | February 14, 2017 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 70A01-1606-PL-1382 |
| v. | Appeal from the Rush Superior Court |
| Rush County Area Board of Zoning Appeals, | The Honorable Matthew D. Bailey, Special Judge |
| *Appellee-Respondent,* | Trial Court Cause No. 70D01-1507-PL-220 |
| and | |
| Daniel Sprinkle, *et al.*, | |
| *Appellees-Intervening Respondents.* | |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Petitioner, Flat Rock Wind, LLC (Flat Rock), appeals the trial court's decision, affirming Appellee-Respondent's, Rush County Area Board of Zoning Appeals (BZA), grant of Flat Rock's amended application to construct a commercial Wind Energy Conversion System, subject to the requirement to locate each industrial wind turbine at least 2,300 feet from a non-participating owner's property line.[1]

We affirm

## ISSUES

Appellant raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion in permitting a group of landowners to intervene in these judicial review proceedings pursuant to Indiana Trial Rule 24(A)(2); and

(2) Whether the trial court erred in affirming the BZA's zoning decision approving Flat Rock's amended application for a special exception to construct a commercial Wind Energy Conversion System, subject to a

---

[1] We held oral argument in this cause on January 13, 2017, at the court of appeals courtroom in Indianapolis, Indiana. We thank the parties for their excellent advocacy.

setback requirement that was both greater and measured differently than the zoning ordinance's minimum setback requirement.

## FACTS AND PROCEDURAL HISTORY

This case stems from Flat Rock's efforts to develop a 180-megawatt commercial Wind Energy Conversion System (WECS) located on more than 29,000 acres of land in Rush and Henry Counties. As originally planned, the WECS would be comprised of ninety-five wind turbines, with sixty-five wind turbines sited in Rush County. On March 30, 2015, Flat Rock filed an application for approval of a special exception to the Rush County zoning ordinance (Zoning Ordinance) to construct and operate that portion of the WECS located in Rush County. Prior to applying for the special exception, and in reliance on the Zoning Ordinance, Flat Rock entered into numerous lease agreements with landowners in Rush County who agreed to make their land available for the commercial development of wind energy. This proposed development represented an estimated $305 million investment in the county that would create more than 200 construction jobs and up to twelve full-time local positions. The project was anticipated to pay an estimated $21.9 million in landowner lease payments and substantial amounts in local property taxes.

Rush County's Zoning Ordinance characterizes the construction of a WECS as a special exception to the Zoning Ordinance, subject to approval of the BZA and certain uniform siting regulations. The Zoning Ordinance, as a whole, emphasizes that "[t]he general trend in zoning has been to maintain certain rights of the individual, but to carefully control them in the hope that his

development will not have adverse effects on the society around them. This is the basic aim of zoning in general, and this ordinance in particular." (Appellees' App. Vol II, p. 23). Its intent, in pertinent part, is "to preserve property values and promote public health, safety, comfort, convenience, and general welfare." (Appellees' App. Vol II, p. 24). Beyond this general statement, the WECS-specific provisions of the Zoning Ordinance underscore that they are "intended to preserve the health and safety of the public." (Zoning Ordinance, Sec. 6.4.2).

[6] The Zoning Ordinance delegates to the BZA the authority to interpret and enforce the zoning ordinance, as well as the exclusive power to hear and decide applications for special exceptions. "In their interpretation and application, the provisions of [the Zoning Ordinance] shall be held to be minimum requirements, adopted for the promotion of the public health, safety or general welfare." (Zoning Ordinance, Sec. 15). With respect to Flat Rock's WECS special exception application, the BZA is authorized, among other duties, "to decide such questions as are involved in determining whether special exceptions should be granted" and "to grant special exceptions with such conditions and safeguards as are appropriate under this ordinance, or to deny special exceptions when not in harmony with the purpose and intent of the ordinance." (Zoning Ordinance, Sec. 10.2). The applicant for a WECS special exception bears the burden of satisfying both Section 10.2 of the Zoning Ordinance, setting forth general criteria applicable to all special exceptions, and Section 6.4

of the Zoning Ordinance, pertaining specifically to the construction of WECS in Rush County.

[7] In its WECS special exception application, Flat Rock provided a certification that the proposed wind turbines would meet the Zoning Ordinance's requirement of a 1,000 feet setback from residential dwellings. On May 7, 2015, the BZA held a public hearing on Flat Rock's application. Flat Rock's representatives and a number of supporters appeared at the hearing to speak in favor of the proposed WECS, while landowners and numerous other Rush County residents were present as remonstrators against the proposed project.

[8] The BZA's staff and planning consultant had prepared a comprehensive report, evaluating Flat Rock's application. The overall review of the project was hindered, however, because of the incomplete nature of the application. Due to numerous issues with the application, and since Flat Rock had yet to determine the size, number, or design of the wind turbines, the BZA's planning consultant acknowledged that "there's still a lot of information that's still in the air" and there were "so many things that—that we are still not clear on." (Appellant's App. Vol. II, p. 13). The BZA's staff report affirmed that "[b]ecause of the detailed information involved in this request and the unusual nature of the land use, it is recommended that the BZA continue this request until it has had adequate time to review all of the material." (Appellant's App. Vol. II, p. 13). Before continuing the hearing, the BZA received evidence from the landowners and other remonstrators bearing on the adverse health effects and negative impact to property values resulting from Flat Rock's proposed WECS. Among

other authorities purporting to establish adverse impacts from the WECS, the evidence before the BZA included a paper authored by two acoustical engineering experts acknowledging that "[s]tudies already completed and currently in progress describe significant health effects associated with living in the vicinity of industrial grade wind turbines." (Appellant's App. Vol. II, p. 13). After addressing the long-term adverse health effects documented to result from residing in the proximity of a commercial wind turbine, these experts proposed increasing the distance between a rural residence and the current industrial grade wind turbines to at least one kilometer (equating to approximately 3,280 feet). Relying on the conclusions of this paper, the remonstrators requested the BZA to impose, as a condition to any grant of the application, increased setback distances "to a much more safe distance of 2,640 feet" between the turbines and residences of non-participating owners[2]. (Appellant's App. Vol. II, p. 133). Agreeing with the staff's recommendation and the finding that additional time was needed to further study Flat Rock's request for a special exception, the BZA continued the public hearing to July 1, 2015. On June 17, 2015, Flat Rock amended its WECS special exception application by voluntarily increasing the distance of its wind turbines from non-participating residences by 40%—from 1,000 feet to 1,400 feet.

---

[2] A non-participating owner is a landowner who does not lease his land to Flat Rock as part of the WECS project.

On July 1, 2015, the BZA conducted a lengthy hearing on Flat Rock's amended WECS application. Again, as during the first hearing, the BZA staff and the planning consultant had prepared and submitted a comprehensive report which evaluated Flat Rock's application and addressed the general criteria applicable to all special exceptions under the Zoning Ordinance, as well as the additional criteria applicable to WECS. Relying on a study from the nonprofit Acoustic Ecology Institute in Santa Fe, New Mexico, the staff report noted, in pertinent part, that:

> Most of the reports to date that have concluded turbines are harmless examined "direct" effects of sound on people and tended to discount "indirect" effects moderated by annoyance, sleep disruption, and associated stress. Research that considered indirect pathways has yielded evidence strongly suggesting the potential for harm.
>
> **Noise Variability** – Turbine noise (the aerodynamic noise produced by air moving around the spinning blades as opposed to any mechanical noise from the motor) is often deemed more annoying than the hum or roar of transportation noise because of its repetitive nature and high variability in both level and quality – from "swoosh" to "thump" to silence, all modulated by wind speed and direction. This pulsing, uneven quality enables the noise to repeatedly capture the attention and become even more difficult to ignore.
>
> **Night Noise** – Unlike vehicle traffic, which tends to get quieter after dark, turbines can sound louder overnight. The absolute noise level of the wind farm may be no more than during the day, but it can be 10-20 decibels louder than the quieter nighttime ambient sound levels. This detail has important implications for sleep disruption.

> **Noise frequency** – Wind turbines generate lower frequencies of
> sound than traffic. These lower frequencies tend to be judged as
> more annoying than higher frequencies and are more likely to
> travel through walls and windows. Sound frequency lower than
> 20 Hz – inaudible to the human ear – has been associated in
> some studies with symptoms including fatigue, sleeplessness, and
> irritability, as well as changes to the physiology of the inner ear
> that have poorly understood complications.
>
> Residents of rural areas where turbines are more common may
> be people who are naturally more sensitive to noise than the
> population at large. They may have greater expectations of quiet
> and be more aware of noise disturbances, amplifying the
> potential for health effects related to environmental noise.
>
> There will likely be noise impacts on the surrounding area
> resulting from the proposed commercial WECS.

(Appellant's App. Vol. II, pp. 15-16).

[10] As with the initial public hearing, following Flat Rock's presentation, remonstrators presented evidence to the BZA as to the adverse health effects and impact on property values resulting from WECS. Consistent with the information conveyed in the BZA's staff report and addressed during the planning consultant's presentation, the BZA received evidence that included an acoustical engineering expert's published report analyzing the peculiar infrasound and low frequency noises generated by commercial wind turbines and resulting long-term adverse health effects to those residing in proximity to such large turbines. The BZA also received evidence about the recommended setback requirement—with one remonstrator noting a turbine manufacturer's

recommended setback distance as 6,562 feet—and the wind farm's potential negative impact on surrounding property values, with potential price reductions of 65%.

[11] Following the public comments, BZA member Joe Rathz moved to approve Flat Rock's amended WECS application "as presented" with the conditions and commitment "that have been provided to us." (Appellant's App. Vol. II, p. 17). The motion failed for lack of a second. BZA member Steve Cain (Cain) then moved to approve the WECS special exception with the condition that the setback distance be increased from the Zoning Ordinance's specified 1,000 feet to 2,640 feet from any property line. That motion likewise failed for lack of a second. Expressing concern over the proximity of the large wind turbines to residential properties, and with Cain's preceding motion having failed, BZA member Larry Copley (Copley) moved to approve the WECS special exception with a 2,300 feet setback condition (Setback Condition). This motion was clarified to reflect that the 2,300 feet applied to the setback distance between the wind turbines and properties of non-participating owners, with the special exception subject to the remaining conditions and written commitment addressed in the staff report's recommendations. Copley's motion passed by a majority vote of the BZA members. The BZA's written findings of fact were approved on September 3, 2015. In its findings, the BZA formulated the Setback Condition as follows:

> In order to protect health and safety and for any other set forth within these findings, the BZA imposes a greater minimum setback for non-participating properties of 2,300 feet, as

measured from the center of the WECS turbine to the property line of the non-participating property owner's land.

(Appellant's App. Vol. III, p. 12). The BZA also included multiple references to several other special criteria being satisfied only after factoring in the Setback Condition.

[12] On July 22, 2015, Flat Rock filed a verified petition with the trial court seeking judicial review of the BZA's zoning decision, with particular emphasis on the Setback Condition. Several landowners (Remonstrators) filed a motion and an amended motion to intervene on August 5 and August 17, 2015, respectively. Flat Rock objected to the motion to intervene on August 26, 2015. After a hearing, the trial court granted Remonstrators' amended motion to intervene on November 18, 2015.

[13] On April 13, 2016, after receiving briefs from Flat Rock, the BZA, and Remonstrators with respect to their various positions, the trial court conducted a hearing on Flat Rock's petition for judicial review. On May 27, 2016, the trial court entered its findings of fact and conclusions thereon, affirming the BZA's July 1, 2015 zoning decision. In its Judgment, the trial court noted, in pertinent part, as follows:

> 33. Implicit in the BZA's decision is that, but for the imposition of the condition increasing the setback distance to 2,300 feet, the commercial WECS special exception failed to satisfy the Zoning Ordinance. In particular, absent the Setback Condition, Flat Rock's WECS special exception would at minimum adversely affect the public interest, not be in harmony with the purpose and

intent of the Zoning Ordinance, fail to adequately address the economic and noise effects on adjoining properties generally in the district, and not be generally compatible with adjacent and other properties in the district. This position is further consistent with the BZA's written Findings of Fact subsequently approved on September 3, 2015. The BZA's Findings of Fact contain references to multiple special exception criteria being satisfied only after factoring in the Setback Condition[.]

58. The BZA had the opportunity to carefully consider the purpose and intent of the Zoning Ordinance and all of the applicable provisions concerning the commercial WECS special exception. Through a majority vote of its members, the BZA interpreted the "Minimum Setback Distance" set forth in Section 6.4.6.4.1 of the Zoning Ordinance as the "minimum" and subject to being increased based on the particular record before it as a condition to granting Flat Rock's commercial WECS exception.

* * * *

63. Based upon the record and applicable law, the [c]ourt concludes that the BZA in this case properly acted within its broad authority and discretion in imposing the Setback Condition, along with numerous other conditions and restrictions, as part of the decision granting Flat Rock's amended commercial WECS special exception application.

* * * *

66. Based upon the record, and within the applicable standard of review, the [c]ourt concludes that the Setback Condition was supported by substantial evidence in the record. The evidence received by the BZA supported setback distances of at least 2,300 feet from non-participating owner's property line for reasons of both health and preservation of property values. While the BZA

had before it various conflicting evidence, a reviewing court does not "reweigh the evidence or reassess the credibility of witnesses; rather, the reviewing court must accept the facts as found by the zoning board."

(Appellant's App. Vol. II, pp. 18, 24, 26, 27-28) (internal references omitted).

Flat Rock now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Intervening Remonstrators*

Relying on I.C. § 36-7-4-1606(f), Flat Rock contests the trial court's grant of Remonstrators' motion to intervene. The grant or denial of a motion to intervene is within the discretion of the trial court. *Herdrich Petroleum Corp. v. Radford*, 773 N.E.2d 319, 324 (Ind. Ct. App. 2002), *reh'g denied, trans. denied*. We review a trial court's decision to allow an intervention for an abuse of discretion. *Id*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or reasonable and probable inferences to be drawn therefrom. *Id*.

Flat Rock disputes the Remonstrators' intervention because the Remonstrators failed to demonstrate that they were persons "aggrieved" pursuant to I.C. §§ 36-7-4-1606(f) & -1603(a)(2). The 1600 series of Chapter 4 of the zoning code pertains to judicial review, with section 1606(f) elaborating on the requirements for intervention. Specifically, the section provides:

Any person who has standing under section 1603(a)(2) or section 1603(a)(3) of this chapter [] an unconditional right to intervene in a proceeding for review. A motion to intervene in a proceeding for review shall be filed in the manner provided by the rules of procedure governing civil actions in courts.

Section 1603(a)(2) requires a person seeking "to obtain judicial review of a zoning decision" to be "[a] person aggrieved by the zoning decision[.]" In order to be aggrieved by a zoning decision, our supreme court has held that:

the petitioner must experience a substantial grievance, a denial of some personal or property right or the imposition . . . of a burden or obligation. The board of zoning appeals' decision must infringe upon a legal right of the petitioner that will be enlarged or diminished by the result of the appeal and the petitioner's resulting injury must be pecuniary in nature. A party seeking to petition for certiorari on behalf of a community must show some special injury other than that sustained by the community as a whole.

*Bagnall v. Town of Beverly Shores*, 726 N.E.2d 782, 786 (Ind. 2000) (internal references omitted).

[17] Instead of applying these statutory requirements, the trial court evaluated Remonstrators' motion to intervene in accordance with Indiana Trial Rule 24(A)(2). Indiana Trial Rule 24(A)(2) provides for an intervention

when the applicant claims an interest relating to a property, fund or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect his interest in the

property, fund or transaction, unless the applicant's interest is adequately represented by existing parties.

Indiana cases addressing T.R. 24(A)(2) have traditionally adopted a three-part test, requiring intervenors to show: (1) an interest in the subject of the action; (2) disposition of the action may as a practical matter impede the protection of that interest; and (3) representation of the interest by existing parties is inadequate. *See, e.g., Moran Elec. Serv., Inc. v. Comm'r, Ind. Dep't of Environmental Mngmt*, 8 N.E.3d 698, 707 (Ind. Ct. App. 2014) (internal reference omitted), *affirmed on reh'g, trans. denied*.

[18] We posit that the trial court pursued the proper review of Remonstrators' motion to intervene. As noted above, I.C. § 36-7-4-1603(a)(2) sets forth the standing requirement of being "aggrieved" for a person seeking "*to obtain judicial review* of a zoning decision." (emphasis added). Once this standing requirement is met, the person receives "an unconditional right to intervene" in a proceeding for review. I.C. § 36-7-4-1606(f). Here, Remonstrators did not seek judicial review of the BZA's decision; rather, the BZA's decision rejecting Flat Rock's application for a WECS special exception was favorable to them. Accordingly, as such, Remonstrators fell outside the province of I.C. § 36-7-4-1603(a)(2) and could not apply for an unconditional right to intervene. Nonetheless, after Flat Rock initiated judicial review of the BZA's decision, Remonstrators sought intervention in a pending judicial proceeding pursuant to the second sentence of I.C. § 36-7-4-1606(f) and availed itself of the "rules of procedure governing civil actions in courts." *See* I.C. § 36-7-4-1606(f).

[19] We expressly reject Flat Rock's assertion that "[t]he 1600 Series requires that all parties to a judicial review proceeding—including any intervenors—have standing as an [sic] 'aggrieved persons.'" (Appellant's Reply Br. p. 11). Flat Rock's generalized claim interprets the statute too narrowly and would effectively make the second sentence of I.C. § 36-7-4-1606(f) meaningless. *Spaulding v. Int'l Bakers Servs., Inc.*, 550 N.E.2d 307, 309 (Ind. 1990) ("Where possible, we interpret a statute such that every word receives effect and meaning and no part is rendered meaningless if it can be reconciled with the rest of the statute.")

[20] By applying the "rules governing civil actions in court," the trial court relied on the tripartite test of T.R. 24(A)(2) to review Remonstrators' motion to intervene and found all three elements satisfied by the Remonstrators. *See* I.C. § 36-7-4-1606(f). When evaluating the applicability of T.R. 24(A)(2), "the facts alleged in a petition to intervene must be taken as true and the decision on a motion to intervene turns on the sufficiency of the claim asserted." *Allstate Ins. Co. v. Keltner*, 842 N.E.2d 879, 882 (Ind. Ct. App. 2006). In their petition, Remonstrators alleged to be interested parties by virtue of their ownership of real estate in the immediate vicinity of the wind facility proposed by Flat Rock. They claim that if the decision of the BZA is modified or reversed, their real estate values and personal health will be significantly and directly affected. Additionally, if the BZA, at some point, elects to change its decision or settle the lawsuit, Remonstrators would no longer be adequately represented by the BZA. As all three requirements of T.R. 24(A)(2) are satisfied, we conclude that

the trial court did not abuse its decision by granting the Remonstrators' motion to intervene.

## II. *Zoning Ordinance*

[21] By increasing the siting requirements for Flat Rock's WECS from the Zoning Ordinance's 1,000 feet to the BZA's imposed Setback Condition of 2,300 feet, the BZA interpreted Rush County's Zoning Ordinances and applied them to the situation at hand. Flat Rock now contends that affirming the BZA's action would grant "the BZA carte blanche to re-write the Zoning Ordinance at the BZA's whim and has allowed the BZA to impose a poison pill condition that effectively kills a wind energy project that meets the objective setback requirements in the Zoning Ordinance." (Appellant's Br. pp. 22-23).

## A. *Standard of Review*

[22] When reviewing a decision of a zoning board, an appellate court is bound by the same standard of review as the *certiorari* court. *Crooked Creek Conservation and Gun Club, Inc., v. Hamilton Co. North Bd. of Zoning Appeals*, 677 N.E.2d 544, 547 (Ind. Ct. App. 1997), *reh'g denied, trans. denied*. Under this standard, a reviewing court, whether at the trial or appellate level, is limited to determining whether the zoning board's decision was based upon substantial evidence. *Id*. The proceeding before the *certiorari* court is not intended to be a trial *de novo*, and neither that court nor the appellate court may reweigh the evidence or reassess the credibility of witnesses; rather, reviewing courts must accept the facts as found by the zoning board. *Id*.

[23]     However, as here, a review of the interpretation of a zoning ordinance is a question of law. *Story Bed & Breakfast, LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 65 (Ind. 2004). The ordinary rules of statutory construction apply in interpreting the language of a zoning ordinance. *Id.* Accordingly, if one statute deals with a subject matter in general terms and another deals with a specific part of the same subject, the provisions of the specific statute should prevail over any inconsistent provision of the general statute. *Ind. Waste Systems, Inc. v. Bd. of Com'rs of Howard Cnty.*, 389 N.E.2d 52, 59 (Ind. Ct. App. 1979). Statutes which relate to the same general subject matter are in *pari materia* and should be construed with reference to each other in order to give effect to the provisions of each. *Id.* By construing these statutes as we do, we are giving force and effect to each. *Id.* Specifically with respect to zoning ordinances, we have held that

> the express language of the ordinance controls our interpretation and our goal is to determine, give effect to, and implement the intent of the enacting body. When an ordinance is subject to different interpretations, the interpretation chosen by the administrative agency charged with the duty of enforcing the ordinance is entitled to great weight, unless that interpretation is inconsistent with the ordinance itself. If a court is faced with two reasonable interpretations of an ordinance, one of which is supplied by an administrative agency charged with enforcing the ordinance, the court should defer to the agency. Once a court determines that an administrative agency's interpretation is reasonable, it should end its analysis and not address the reasonableness of the other party's interpretation. Terminating the analysis reinforces the policies of acknowledging the expertise of agencies empowered to interpret and enforce ordinances and increasing public reliance on agency interpretations.

*Hoosier Outdoor Advertising Corp. v. RBL Mgmt., Inc.,* 844 N.E.2d 157, 163 (Ind. Ct. App. 2006) (internal references omitted), *trans. denied*.

[24] Consequently, we presume the determination of the BZA, an administrative agency with expertise in zoning matters, to be correct. *Midwest Minerals Inc., v. Bd. of Zoning Appeals of Area Plan Dept./Com'n of Vigo Cnty*., 880 N.E.2d 1264, 1268 (Ind. Ct. App. 2008), *reh'g denied, trans. denied*. We will reverse only if the BZA's decision is arbitrary, capricious, or an abuse of discretion. *Id*. The powers of the BZA are strictly limited to those granted by its authorizing statute. *Schlehuser v. City of Seymour*, 674 N.E.2d 1009, 1014 (Ind. Ct. App. 1996). Any acts of the BZA that exceed the powers enumerated by the Indiana Code and the local zoning ordinance are *ultra vires* and void. *Id*.

## B. *Rush County's Zoning Ordinance*

[25] Flat Rock contends that the trial court erred in affirming the BZA's decision and focuses its argument squarely upon the denial of its application for a special exception for the WECS project. Its primary argument revolves around the contention that the BZA exceeded its authority by creating a new, extended Setback Condition as well as to alter the prescribed method for measuring this Setback (property line versus residence).

[26]  Referencing the difference instituted by case law between regulatory special exceptions and discretionary special exceptions,[3] Flat Rock characterizes Section 6.4 of the Zoning Ordinance as a "specific objective regulation that a WECS applicant must satisfy;" whereas it views Section 10.2 of the Zoning Ordinance as purely discretionary because it imposes "general, subjective criteria." (Appellant's Br. pp. 29, 30). Accordingly, Flat Rock concludes that the trial court employed the discretionary criteria of Section 10.2 to "impose the Setback Condition, which rewrote the specific, objective development requirements for a WECS in Section 6.4.6.4.1." (Appellant's Br. p. 30).

[27]  Building on this distinction, Flat Rock argues that because it met the objective setback requirement listed in Section 6.4.6.4.1 of the Zoning Ordinance, and even exceeded it by agreeing to modify the location of its wind turbines to 1,400 feet from all non-participating residences, its petition should have been granted. The BZA's reliance on the discretionary Section 10.2—and the trial court's affirmance thereof—to impose the Setback Condition now creates an illegal, arbitrary, and *ad hoc* situation that is "non-uniformly measured only for Flat

---

[3] "[I]f a petitioner for a special exception presents sufficient evidence of compliance with the relevant statutory requirements, the exception must be granted. *Crooked Creek,* 677 N.E.2d at 547-48. The granting of a special exception is mandatory once the petitioner shows compliance with the relevant statutory criteria. *Town of Merrillville Bd. of Zoning Appeals v. Public Storage, Inc.*, 568 N.E.2d 1092, 1094 (Ind. Ct. App. 1991), *trans. denied*. On the other hand, special exceptions are discretionary when the zoning ordinance provides the BZA with a discernable amount of discretion and the board is entitled to determine whether a petitioner has demonstrated that its proposed use will comply with the relevant statutory criteria. *See Crooked Creek*, 677 N.E.2d at 548.

Rock's WECS project" and that creates ambiguity for future wind turbine investments. (Appellant's Br. p. 32).

[28]   To support its decision denying Flat Rock's petition, the trial court relied on our supreme court's opinion in *Fulton Cnty. Advisory Plan Comm'n v. Groninger*, 810 N.E.2d 704 (Ind. 2004), *reh'g denied*. In *Groninger*, the appellees were denied primary approval for a proposed subdivision for failure to comply with the vision clearance standards of the ordinance, after an engineering report obtained by the Zoning Administrator concluded that "the proposed entrance would create hazardous driving conditions." *Id*. at 707. The pertinent part of the ordinance provided that:

> The intent of Vision Clearance Standards are [sic] to provide for a safe vehicular and pedestrian transportation system. The visibility at intersections, driveways, curb cuts, and entrances are particularly important for the safe movement of vehicles and pedestrians.
>
> The following Vision Clearance Standards apply to all intersections, drive[s], curb cuts, and entrances.
>
> A. No curb cut or drive shall be permitted when:
>
> (a) A minimum of 225 feet from the crest of a hill where . . .
>
> (b) A minimum of 175 feet from the crest of a hill where . . .
>
> (c) The visibility to or from the desired location is determined to be impaired by the Zoning Administrator.

*Id*. at 706. After modification of their original petition, the Groningers submitted a modified plan that changed the location of the roadway entrance and which met the vision clearance standards. *Id*. at 707. Nonetheless, instead of starting construction, the Groningers filed a complaint arguing that their original proposal had complied with the standards. *Id*. The Groningers argued that (a) and (b) were the "requirements" of the ordinance for approval, and because both had been met, they were entitled to approval. *Id*. at 708.

[29] Our supreme court defined the issue at hand as to "whether the language and requirements of the ordinance can be understood with reasonable certainty." *Id*. Interpreting the Vision Clearance Standards, the *Groninger* court noted that subsections (a) and (b) set forth minimum standards and clarified that

> the import of the use of the word "minimum" in both subsections (a) and (b) is that 225 feet or 175 feet may well not be enough if visibility is nevertheless impaired because of the grade or shape of the road, foliage considerations, and the like. Because the plain language of subsections (a) and (b)—again, the use of the word "minimum"—puts a reader on notice that more may very well be required in order to receive approval for an entrance, the Groningers are incorrect in asserting that their plat was entitled to be approved simply because it met the 225/175 feet benchmarks.

*Id*. By reading all subsections together, the supreme court found that "an applicant would understand the [o]rdinance with reasonable certainty to require an entrance to be built to satisfy the purpose of avoiding visual impairment, not just the minimums of sections (a) and (b)." *Id*. at 709. Our supreme court

concluded that the visual clearance standards "placed the Groningers on notice" of a condition that would be evaluated by the Plan Commission: whether the proposed entrance created a visual impairment. *Id.*

[30] Turning to the Ordinance before us, we first note that Rush County's general intent in instituting zoning ordinances is "to maintain certain rights of the individual, but to carefully control them in the hope that his development will not have adverse effects on the society around him." (Zoning Ordinance, Preamble). Overall, the Ordinance's aim is to promote "the health, safety, or general welfare of Rush County." (Zoning Ordinance, Preamble).

[31] To be granted a WECS special exception, an applicant bears the burden of satisfying both Section 10.2 of the Zoning Ordinance setting forth the general criteria applicable to all applications, as well as Section 6.4 of the Zoning Ordinance, pertaining specifically to WECS. The Zoning Ordinance in Section 10.2 (emphasis added) provides, in part, that the BZA can:

> [] Hear and decide only such special exceptions as the [BZA] is specifically authorized to pass on by the terms of this ordinance; to decide such questions as are involved in determining whether special exceptions should be granted; and *to grant special exceptions with such conditions and safeguards as are appropriate under this ordinance, or to deny special exceptions when not in harmony with the purpose and intent of this ordinance.*

[32] The purpose of Section 6.4, WECS Regulations, is defined as:

> Assure that any development and production of wind-generated electricity in Rush County is safe and effective:

Facilitate economic opportunities for local residents; and

Promote the supply of wind energy in support of Indiana's alternative energy sources potential and other such economic development tools.

(Zoning Ordinance, Sec. 6.4.1). The expressed legislative intent is "to provide a regulatory scheme for the construction and operation of WECS in the county; *subject to reasonable restrictions these regulations are intended to preserve the health and safety of the public*." (Zoning Ordinance, Sec. 6.4.2) (emphasis added). The Zoning Ordinance's specifications for WECS projects are over twenty pages long and cover the entire scope of a WECS development, from the initial zoning application, to permitting, to the final decommissioning of the wind energy project. In particular, with regard to the setback requirements, the Zoning Ordinance details that the distance from a "[r]esidential dwelling, measured from the center of the WECS to the nearest corner of the structure" must have a "*minimum* setback distance" of "one thousand (1,000) feet for non-participating landowners." (Zoning Ordinance, Sec. 6.4.6.4.1) (emphasis added).

[33] When faced with an interpretation of its Zoning Ordinance, the BZA is guided by Section 15, which clarified that:

In their interpretation and application, the provisions of this ordinance shall be held to be *minimum requirements,* adopted for the promotion of the public health, safety, or general welfare. Whenever the requirements of this ordinance are at variance with the requirements of any other lawfully adopted rules, regulations,

ordinances, deed restrictions, or covenants, the most restrictive or that imposing the higher standards, shall govern.

(Zoning Ordinance, Sec. 15) (emphasis added).

[34] Unlike Flat Rock, who maintains that the BZA derived its discretionary power from the general subjective criteria of Section 10.2 of the Zoning Ordinance, we find that the BZA's power to impose the enlarged Setback Condition squarely derives from Section 6.4 of the Zoning Ordinance by its reference to a "minimum setback distance." (Zoning Ordinance, Sec. 6.4.6.4.1). Section 10.2 of the Zoning Ordinance explicitly reinforces the BZA's discretionary power under Section 6.4 while at the same time defining the boundaries of this discretion as the "condition and safeguards as are appropriate under this ordinance or to deny special exceptions when not in harmony with the purpose and intent of this ordinance." (Zoning Ordinance, Sec. 10.2). Similar to *Groninger*, Flat Rock was placed on notice by the insertion of the word "minimum" that the setback would be evaluated by the BZA in light of Section 10.2 of the Zoning Ordinance. *See Groninger*, 810 N.E.2d at 709.

[35] Over the course of two hearings, the BZA had the opportunity to carefully consider the statutory setback requirement of Section 6.4 and its implications on the life, health, and safety of the surrounding landowners. It received evidence in favor of the project and in opposition of constructing the windfarm. Ultimately, and based on the evidence presented at the hearings, the BZA, in its approved Findings of Fact, explicitly found that "an additional setback is necessary to protect health and safety on non-participating properties and

owners, and imposes as a condition on the grant of the special exception a minimum setback of 2,300 feet, to be measured from the center of the WECS turbine to the non-participating property line." (Appellant's App. Vol. III, p. 7).

[36] Based on the explicit language of the Zoning Ordinance, we conclude that the BZA did not exceed its authority by creating the Setback Condition, as well as a new method for measuring this Setback. In interpreting the Zoning Ordinance, the BZA viewed the siting setback as a "minimum" guideline, which was subject to "reasonable restrictions" to preserve the health and safety of the public. (Zoning Ordinance, Sec. 6.4.2; *see also* Zoning Ordinance 10.2). By evaluating Flat Rock's proposed commercial WECS project as planned and the evidence and testimony received during the hearings, the BZA imposed the Setback Condition to promote the Zoning Ordinance's and the WECS' special exception's stated purpose to promote the public interest. Because we find the BZA's interpretation reasonable and consistent with the Zoning Ordinance itself, we must defer to the agency's decision. *See Hoosier Outdoor Advertising Corp.*, 844 N.E.2d at 163. Accordingly, as the BZA did not exceed its powers, we affirm the trial court's decision.

## CONCLUSION

[37] Based on the foregoing, we hold that the trial court properly permitted Remonstrators to intervene pursuant to T.R. 24(A)(2); and the BZA did not exceed its power by interpreting the WECS special exception in the Zoning Ordinance.

[38] Affirmed.

[39] Crone, J. and Altice, J. concur