

FILED

Jun 08 2018, 5:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| | |
|---|---|
| ATTORNEYS FOR APPELLANTS | ATTORNEY FOR APPELLEE: INDIANAPOLIS HISTORIC PRESERVATION COMMISSION |
| James K. Gilday<br>Gilday & Associates, P.C.<br>Indianapolis, Indiana | Thomas J.O. Moore<br>Office of Corporation Counsel<br>Indianapolis, Indiana |
| Gene R. Leeuw<br>Leeuw Oberlies & Campbell, P.C.<br>Indianapolis, Indiana | ATTORNEYS FOR APPELLEE:<br>DAN JACOBS |
| | Jason A. McNiel<br>Derek R. Molter<br>Samuel Gardner<br>Ice Miller LLP<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lockerbie Glove Factory Town Home Owners Association, Inc., Andre B. Lacy, Julia L. Lacy, Elliot J. & Serena Androphy, Cherri D. Hobgood, James & Cheryl Arnold, and William B. Young, | June 8, 2018 |
| | Court of Appeals Case No. 49A02-1708-CT-1681 |
| *Appellants-Petitioners,* | Appeal from the Marion Superior Court |
| v. | The Honorable Michael D. Keele, Judge |
| Indianapolis Historic Preservation Commission, and Dan Jacobs, | Trial Court Cause No. 49D07-1609-CT-32940 |
| *Appellees-Respondents.* | |

**Robb, Judge.**

# Case Summary and Issues

[1] Lockerbie Glove Factory Town Home Owners Association, Inc., and eight residents of the townhomes (collectively "Remonstrators") appeal a decision by the Indianapolis Historic Preservation Commission ("Commission") granting a certificate of appropriateness to Dan Jacobs for the purpose of constructing a retail, residential, and parking project known as "Block 20" on a parcel of land in the Lockerbie Square Historic District in Indianapolis, Indiana. The Remonstrators raise several issues for our review which we consolidate and restate as: 1) whether a Commission member was presumptively biased, making the Commission decision invalid, and if there is no presumed bias, whether the trial court should have granted the Remonstrators' motion to compel to allow discovery regarding actual bias; and 2) whether the trial court erred in denying the Remonstrators' petition for judicial review. Concluding the Remonstrators failed to show that the Commission decision was invalid due to bias or that they are otherwise entitled to relief from the Commission decision, we affirm.

# Facts and Procedural History

[2] The Commission was created in 1967. In 1982, the Commission's enabling legislation was recodified at Indiana Code chapter 36-7-11.1. The Commission is a nine-member appointed board tasked with preserving historically significant

areas and structures in Indianapolis. The Commission designates historic districts, which may be a single structure or a larger area, adopts a historic preservation plan for the area, and then has design and zoning review jurisdiction within those districts. After the adoption of a historic preservation plan for any historic district, "all governmental agencies shall be guided by and give due consideration to the plan in any official acts affecting the area." Ind. Code § 36-7-11.1-8(c). Pursuant to Indiana Code section 36-7-11.1-9(a), "[a] person may not construct any exterior or architectural structure or feature in any historic area . . . until the person has filed with the secretary of the [C]ommission an application for a certificate of appropriateness . . . ." The Commission must hold a public hearing on any such application and "determine whether the proposal will be appropriate to the preservation of the area and to the furtherance and development of historic preservation." Ind. Code § 36-7-11.1-9(c). If the Commission determines the proposed construction will be appropriate, the secretary shall issue a certificate of appropriateness. Ind. Code § 36-7-11.1-10(a). However, the Commission "may impose any reasonable conditions, consistent with the historic preservation plan, upon the issuance of a certificate of appropriateness . . . ." Ind. Code § 36-7-11.1-10(b). "A final determination of the [C]ommission upon an application for certificate of appropriateness is subject to judicial review in the same manner and subject to the same limitations as a final decision of a board of zoning appeals under IC 36-7-4." Ind. Code § 36-7-11.1-10(c).

[3]     The Commission first created a historic preservation plan ("historic plan") for Lockerbie Square in 1968, which was revised and updated in 1978 and again in 1987. The original Lockerbie Square historic district (known as the "Historic Core") is a four-block area bounded by East Street to the west, Michigan Street to the north, College Avenue to the east, and New York Street to the south. The historic district has since been expanded to include additional properties outside but contiguous to the Historic Core (known as the "Secondary Area"). In 1973, the Lockerbie Square People's Club, a neighborhood association, was formed to promote the revitalization of the Lockerbie Square neighborhood, and eventually a group of residents formed Lockerbie Square Foundation, Inc., a not-for-profit focused on fundraising for preservation projects.

[4]     The 1968 plan "provided planning recommendations to guide the future development of the area." Appendix of Appellants, Volume 6 at 13. But the plan "did not reflect the maturing preservation philosophy gaining acceptance around the country which promotes historic districts as neighborhoods in which people live . . . ." *Id.* Therefore, the 1968 plan was revised in 1978 in an attempt "to preserve the unique historic character of Lockerbie Square by encouraging the revitalization of the district as a dynamic urban neighborhood . . . ." *Id.* The 1978 plan "sought to assist [the rehabilitation] effort through education and through the review of all development and redevelopment activities within the district." *Id.* The 1987 update "follows a recommendation incorporated into the 1978 plan" to shift the emphasis to new development on

existing vacant land once the majority of historic properties were rehabilitated. *Id.*

[5] In 2001, the Athenaeum Foundation acquired property at 428 N. East Street and sought from the Commission a certificate of appropriateness that would allow it to demolish the building then existing on that property and turn the property into a paved surface parking lot. The property in question is part of the Secondary Area of the Lockerbie Square Historic District, bounded on the west by Cleveland Street, on the north by Michigan Street, on the east by East Street, and on the south by Allegheny Street. The People's Club supported the Athenaeum's request to demolish the building, but opposed the property being used as a parking lot on a long-term basis as the historic plan's recommended land use for the property was residential. The Commission issued the certificate of appropriateness but, pursuant to its authority under Indiana Code section 36-7-11.1-10(b), required the following recorded covenants: that the certificate of appropriateness would allow use of the property as a parking lot for a period of three years; that the property would not be used as a parking lot beyond those three years unless the Athenaeum had applied for and was granted another certificate of appropriateness; that during the three year period, the Athenaeum would use reasonable and good faith efforts to support alternative parking solutions within two blocks of the property; and that if reasonable alternative parking was established within two blocks within three years, the Athenaeum would "diligently pursue using the [property] for residential purposes pursuant to the [historic plan]." *Id.*, Vol. 4 at 13-14.

[6] Over the next fifteen years, the Athenaeum worked with the People's Club and various other organizations to fulfill the covenant and develop the property. On April 28, 2016, Dan Jacobs submitted an application for a certificate of appropriateness for the Block 20 project on the property. The application describes the project as a "229 space parking garage, wrapped with 67 apartment units," with retail space on the first floor. *Id.*, Vol. 4 at 80. Jacobs held several meetings with Commission staff members, appeared at two preliminary review hearings, and made numerous changes to the plans in response to concerns voiced by the Commission and community members. By the time of the final hearing, the plans called for a five-story, multi-use building with sixty-seven apartment units, retail and gallery space on the first floor, a roof deck, and 261 internal parking spaces, including sixty-seven spaces for residents and 194 spaces for the public. The final hearing was scheduled for August 3, 2016.

[7] On July 27, 2016, the Remonstrators submitted a letter to the Commission outlining their objections to the project. The Remonstrators are all residents of the Lockerbie Glove Factory Town Homes, fifty-eight single family homes adjacent to the proposed development by virtue of being situated on the east side of East Street. They are not a part of, nor are they represented by, the People's Club. The Remonstrators raised several objections to Jacobs' application for certificate of appropriateness, including: 1) that the covenant prohibits anything other than residential use on the property; 2) the project violates the historic plan in multiple ways; 3) the project will increase noise in

certain areas; 4) the project will adversely affect traffic on East Street; and 5) "[s]ome parts of the so-called residential portion of the development seem more like short-term leasing, which fits more the description of a hotel . . . ." *Id.*, Vol. 2 at 44.[1]

[8]     At the final hearing on August 3, 2016, the People's Club voiced its "strong support" of the project. *Id.*, Vol. 5 at 121. The Remonstrators, represented by James Gilday, Treasurer of the Glove Factory HOA, spoke in opposition to the application, raising as their "main point" the multiple violations of the historic plan. *Id.* at 122. The Remonstrators asked the Commission to "fulfill its duty to enforce the historic plan and disregard all other considerations to the contrary by rejecting this proposal." *Id.* at 128-29. A Commission staff member then addressed the Commission:

> We've had probably a dozen meetings on this project over the last couple of months. And I think the comment that was made earlier about the design evolving for the better, staff would agree with that. And in addition to what's in the staff report, I would like to address some of the comments that were just made. . . . I would like to reiterate that the Lockerbie Square [historic] plan is a set of recommended guidelines for any project. Staff is not

---

[1] The Remonstrators repeatedly assert that Jacobs called the building a "hotel" at some point, *see* Brief of Appellants at 12, and assert that he did so at a July 19, 2016, meeting of the People's Club, *see* Reply Brief of Appellants at 7-8. However, the July 19, 2016, meeting of the People's Club is not transcribed or otherwise memorialized in the record, and the only record evidence the Remonstrators cite in support is their own petition for judicial review, App. of Appellants, Vol. 2 at 33, their own letter to the Commission in advance of the final hearing on the certificate of appropriateness, *id.*, Vol. 2 at 40, and their own statement to the Commission at the final hearing, *id.* Vol. 5 at 125. The Remonstrators contend that Jacobs' failure to rebut the Remonstrators' statement is a tacit admission. However, Jacobs and others involved in seeking the certificate of appropriateness repeatedly referred to the residential component of the building as "apartments" before the Commission.

aware of anything in the plan being necessarily [a] requirement, so that somebody would be in violation of if they didn't comply with that, but rather a set of guidelines to direct staff in making a recommendation on the proposed design, which is what we did in the staff report.

*Id.* at 129-30. Commission staff recommended the application for a certificate of appropriateness be approved, and the recommendation was approved by the Commission five to one. One of the Commissioners voting to approve the certificate of appropriateness was Alex White. At the end of the first preliminary review hearing in June, Commissioner White had stated,

Mr. Jacobs, just one thing, you probably considered this. I was on the Athenaeum building committee for many years, and we had a devil of a time dealing with acoustics from the successful band shell and the interior theater. So I don't know if you have an acquisition[2] on your consultant list yet, but that might be advice on how you treat this, especially the façade facing the Athenaeum.

*Id.* at 91-92.

[9] The Remonstrators then filed a petition for judicial review in Marion Superior Court. While the case was pending, the Remonstrators filed a motion to compel, seeking discovery from the Commission on the issue of the possible

---

[2] Given the context of the statement, what is transcribed as "acquisition" should probably be "acoustician." During the second review hearing, the Block 20 architect stated they "do have an acoustician coming to town next week who's going to do a full report for us . . . ." *Id.* at 111-12. And during the final hearing, the architect referenced the acoustician's report. *Id.* at 140-41.

bias of Commissioner White in favor of the Athenaeum and Jacobs based on his statement from the first preliminary hearing quoted above. The trial court denied this motion. After briefing and oral argument on the petition for judicial review, the trial court issued its Findings of Fact, Conclusions of Law and Judgment denying the Remonstrators' petition and affirming the Commission's award of a certificate of appropriateness:

> After the multiple hearings, the [Commission], in its expert discretion, voted to issue the Certificate of Appropriateness to Jacobs. [The Remonstrators'] arguments are generally invitations to reweigh the evidence properly considered by the [Commission], which this Court declines to do. [The Remonstrators] have not carried their heavy burden of proving that the [Commission's] decision in this matter was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or unsupported by substantial evidence.

*Id.*, Vol. 2 at 23. The Remonstrators now appeal.

# Discussion and Decision

## I. Standard of Review

[10] Indiana Code section 36-7-11.1-10(c) provides that the Commission's final determination regarding an application for a certificate of appropriateness "is subject to judicial review in the same manner and subject to the same limitations as a final decision of a board of zoning appeals under IC 36-7-4."

Indiana Code section 36-7-4-1614(d) provides that a reviewing court, whether the trial court or this court,

> shall grant relief . . . only if the court determines that a person seeking judicial relief has been prejudiced by a zoning decision that is:
>
> > (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (2) contrary to constitutional right, power, privilege, or immunity;
> >
> > (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (4) without observance of procedure required by law; or
> >
> > (5) unsupported by substantial evidence.

A decision is arbitrary and capricious if it is "patently unreasonable[;] made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion." *City of Indianapolis v. Woods*, 703 N.E.2d 1087, 1091 (Ind. Ct. App. 1998), *trans. denied*. A decision is unsupported by substantial evidence if there is no "relevant evidence which a reasonable mind might accept as adequate to support a conclusion." *Id.* The party seeking judicial review has the burden of demonstrating the invalidity of the decision. Ind. Code § 36-7-4-1614(a).

When we review an administrative decision, we may not reweigh the evidence or reassess the credibility of the witnesses. *Metro. Bd. of Zoning Appeals Div. III of Marion Cty. v. Traders Point Assoc. of Neighborhoods*, 81 N.E.3d 1120, 1124 (Ind. Ct. App. 2017), *trans. denied*. We must accept the facts as found by the board, but we review questions of law de novo. *Id.*[3] We presume the determination of a board or agency with expertise in a given subject is correct. *Flat Rock Wind, LLC v. Rush Cty. Area Bd. of Zoning Appeals*, 70 N.E.3d 848, 858 (Ind. Ct. App. 2017), *trans. denied*.

## II. Commission Bias

The Remonstrators contend the Commission decision is invalid because one of the Commission members was "presumptively biased" in favor of the application. Br. of Appellants at 53. They base their assertion of bias on a single statement Commissioner White made at the first review hearing, wherein

---

[3] The Remonstrators note that Indiana Code section 36-7-4-918.4 states that a variance may be approved by the board of zoning appeals "only upon a determination in writing" and asserts the Commission should also have been required to issue written findings supporting its decision to grant a certificate of appropriateness for the Block 20 project. Because Indiana Code chapter 36-7-11.1 is not silent about written findings, but instead requires written findings only if the Commission determines that a certificate of appropriateness should *not* be issued, Ind. Code § 36-7-11.1-10(b), we cannot agree with the Remonstrators' position.

In addition, the Remonstrators contend that "because of the unique and different role of historic preservation," the standard of review of a Commission decision should be "expand[ed]" beyond that described by Indiana Code section 36-7-4-1614 in order to "reconcile[]" other provisions of Indiana Code chapter 36-7-11.1. Br. of Appellants at 23. The historic preservation statutes as a whole are to be referenced in evaluating whether the Commission decision is appropriate; however, because Indiana Code chapter 36-7-11.1 *specifically* states the standard of review to be used in reviewing the issuing of a certificate of appropriateness, we again cannot agree with the Remonstrators that the standard is to be modified or expanded in this case. As the Remonstrators themselves acknowledge, when relevant statutory language is clear and unambiguous, the statute will be interpreted in its plain, ordinary, and usual sense. *See* Br. of Appellants at 24 (citing *Young v. Hood's Gardens, Inc.*, 24 N.E.3d 421, 424-25 (Ind. 2015)). Section 36-7-11.1-10(c) clearly and unambiguously states the appropriate standard of review for these decisions.

he noted that he had been on the Athenaeum board for several years and suggested that Jacobs consult an acoustician, if he had not already, to consider the acoustic effects of the project in relation to the existing Biergarten at the Athenaeum.

[13] Despite this statement being made at a public hearing at which the Remonstrators' representative was present, the Remonstrators made no objection to Commissioner White's participation in the final hearing and vote. When there is perceived bias by an administrative agency, "the best action is before the board itself, in the form of appropriate objections and/or motions for disqualifications." *Scheub v. Van Kelker Family Ltd. P'ship*, 991 N.E.2d 952, 959 (Ind. Ct. App. 2013). This procedure gives the board the opportunity to correct or prevent an error as a result of bias, and allows the objector the opportunity to preserve error in anticipation of judicial review. *Id.* Having failed to object to Commissioner White's participation or move for his disqualification at or prior to the final hearing, the Remonstrators have waived this issue on judicial review. *See* Ind. Code § 36-7-4-1610 (stating judicial review of an issue not raised before the board is allowed only in two specific circumstances, neither of which is present here).

[14] Waiver notwithstanding, we briefly note that even if bias exists, we presume that an administrative board or panel will act properly and without bias or prejudice, *Jandura v. Town of Schererville*, 937 N.E.2d 814, 819 (Ind. Ct. App. 2010), *trans. denied*, with or without recusal of the allegedly biased members, *Adkins v. City of Tell City*, 625 N.E.2d 1298, 1303 (Ind. Ct. App. 1993). We will

not interfere with the administrative process in the absence of a demonstration of actual bias. *In re Change to Established Water Level of Lake of Woods in Marshall Cty.*, 822 N.E.2d 1032, 1041 (Ind. Ct. App. 2005), *trans. denied*. Commissioner White's statement that he used to be on the Athenaeum board and suggesting, based on his experience, that Jacobs should consult an expert regarding potential noise issues with the project, does not demonstrate actual bias in favor of the project, and the Remonstrators' bald assertion that his statement shows "presumed bias" does not make it so.

[15] The Remonstrators claim the trial court should have granted their motion to compel to allow them to conduct discovery to supplement the record on the issue of Commissioner White's actual bias. However, although Indiana Code section 36-7-4-1612 allows supplementation of the record under certain circumstances, it is only allowed "if the additional evidence could not, by due diligence, have been discovered and raised in the board proceeding giving rise to a proceeding for judicial review." Ind. Code § 36-7-4-1612(a). As noted above, Commissioner White's statement was made in a public hearing with the Remonstrators' representative in attendance. The issue could have been raised with the Commission at any time prior to the final vote, but it was not. Therefore, the trial court did not err in denying the Remonstrators' motion to compel.

# III. Certificate of Appropriateness

[16] The Remonstrators argue the Commission improperly granted the certificate of appropriateness for the Block 20 project for several reasons: multiple provisions of the Historic Preservation Statutes and Lockerbie Square Historic Plan are violated by the project; zoning rules are violated by the commercial components of the project; and the project is prohibited by the restrictive covenant.

## A. Historic Preservation

[17] The Remonstrators contend the Commission decision to issue a certificate of appropriateness to the Block 20 project "violates numerous Historic Preservation Statutes, including the Commission's failure to duly consider the Historic Plan, which are objective historic development standards . . . ." Br. of Appellants at 24.

[18] Indiana Code section 36-7-11.1-8(c) provides that "all governmental agencies"—including the Commission—"shall be guided by and give due consideration to the [historic] plan in any official acts affecting the area." The consideration that is due from the Commission is described in Indiana Code section 36-7-11.1-9. When the Commission hears an application for a certificate of appropriateness, the Commission is to determine whether the proposal will "be appropriate to the preservation of the area and to the furtherance and development of historic preservation" by considering,

> in addition to any other pertinent factors, the visual compatibility, general design, arrangement, color, texture, and

materials in relation to the architectural or other design standards prescribed by the plan or any applicable zoning regulation, the design and character of the historic area, and the architectural factors of other structures in it.

Ind. Code § 36-7-11.1-9(c), (d).[4]  If the Commission determines the proposed construction will be appropriate, the Commission shall issue a certificate of appropriateness.  Ind. Code § 36-7-11.1-10(a).

[19]  The Remonstrators contend the Commission's decision to allow a mixed-use development does not further historic preservation in the Lockerbie Historic District, which they posit "contemplates residential development consistent with the complexion of the predominant single-family home ownership within the [Historic] District."  Br. of Appellants at 27.  The historic plan notes that the recommended zoning and land use maps included in the plan "were developed to act in concert to protect the unique character of Lockerbie Square."  App. of Appellants, Vol. 12 at 47.  The historic plan does contemplate that the "predominant land use" in the Historic Core remain residential, but the plan contemplates a variety of acceptable uses in the Secondary Area.  App. of Appellants, Vol. 12 at 47-48 ("It is recommended that much of the [Secondary

---

[4] The Remonstrators also cite to Indiana Code section 36-7-11-17 as "reinforc[ing] Chapter 11.1-9(d) in providing more restrictions . . . ."  Br. of Appellants at 26.  Section 36-7-11-17 applies to new buildings and structures "within the primary area of the historic district."  The Block 20 project is not within the primary area, or "Historic Core" of the historic district, but rather in the Secondary Area.  *See* Ind. Code § 36-7-11-6(a) (requiring the Commission to submit a map to the legislative body describing the boundaries of a historic district or districts and allowing the map to divide a district into primary and secondary areas); App. of Appellants, Vol. 6 at 9 (Lockerbie Square Historic District Map 2 showing boundaries of the Historic Core and the Secondary Area as of 1987).

Area north, east, and south of the Historic Core] be developed with a mix of residential and compatible commercial uses.").  The fact that the proposed project includes both residential and commercial uses does not undermine historic preservation in this area.  The historic preservation statutes and the historic plan do not exist to *prevent* change, but to encourage and appropriately *guide* revitalization.  *See id.*, Vol. 6 at 13-14 ("Since the majority of historic properties within the . . . Historic Core have been rehabilitated, the emphasis has shifted to new development of existing vacant land in both the Historic Core and the Secondary Area.").

[20]   The Remonstrators also contend that the project is incompatible with the historic plan, which states,

> Because most of the Lockerbie Square Historic Core has been completed, the preservation and revitalization of Lockerbie Square's periphery should be encouraged.  This redevelopment should seek to preserve and respect the existing historic fabric and strengthen the contextual relationship between the Historic Core and Secondary Area.  Construction not in keeping with the visual scale or character of the district should be discouraged . . . .
>
> [A]ll restoration, rehabilitation, and new construction projects *must conform to the design guidelines* set forth in this plan (see Design Standards Section).

App. of Appellants, Vol. 12 at 39 (emphasis added).  The Remonstrators allege the historic plan thus contains *mandatory* provisions supplementing the general

historic preservation statutes.  However, the plan makes clear that the design standards contained therein are *not* mandatory:

> The design standards are to be used as a guide by property owners and others interested in developing a project within the Lockerbie Square Area. . . . *The contents of this chapter are guidelines and should not be read as absolute rules.*  Every project will have its own different set of goals, constraints, problems and impacts, all of which may suggest somewhat differing utilization of the standards.

*Id.*, Vol. 12 at 51.  Thus, there can be no error in granting a certificate of appropriateness to a project that deviates from any of those guidelines, presuming the process of granting the certificate was otherwise observed.  *See* App. of Appellants, Vol. 5 at 122 (Remonstrators' representative arguing to the Commission at the final hearing that "[t]here are multiple violations of the [historic plan] with this proposal"); 129-30 (Commission staff member noting that nothing in the historic plan is "necessarily [a] requirement, so that somebody would be in violation of if they didn't comply with that, but rather a set of guidelines to direct staff in making a recommendation on the proposed design, which is what we did"); 132 (Commission member noting the historic plan contains guidelines, not rules, and the "only kinds of violations that I know of is doing work without going through the approval process").

[21]  With respect to the Commission's decision-making process, the trial court concluded:

The record demonstrates that, over the course of three (3) months and prior to issuing the Certificate of Appropriateness to Block 20, the [Commission] and its staff considered, among other things: (a) the factors included in Indiana Code § 36-7-11.1-9(d); (b) the size and scope of the project; (c) the acoustic effect of the project; (d) the effect of the project on traffic and congestion in the area; (e) the effect of the project on nearby alleyways; (f) letters from the public (including [the Remonstrators'] counsel); (g) the [Commission] staff reports; (h) testimony from Jacobs and his architects; (i) testimony from members of the public (including [the Remonstrators'] counsel); (j) statements from the [Commission] staff; and (k) statements from the [Commission's] members.

App. of Appellants, Vol. 2 at 22.

[22] The record supports the trial court's conclusion. Before issuing a certificate of appropriateness for the Block 20 project, the Commission staff met with Jacobs a dozen times and issued three reports to the Commission, the Commission itself held two public preliminary review hearings and a final public hearing, Jacobs made numerous changes to the project plans in response to concerns raised at each stage of the proceedings, and the Commission heard community members' concerns, both for and against the project. Commission staff believed the "design evolv[ed] for the better" during the process, *id.*, Vol. 5 at 129, and that the "scale of this structure is actually a perfect size for the scale in relationship to the immediate buildings around it," *id.*, Vol. 5 at 131. Ultimately, the Commission voted five to one to issue the certificate of appropriateness per the staff recommendation. One commissioner specifically noted, "I think it's very responsive architecturally." *Id.*, Vol. 5 at 134.

[23]    With respect to new construction, the historic plan notes:

> The purpose of these guidelines is to present concepts, alternatives, and approaches which will produce design solutions that recognize the characteristics and bring harmony between new and existing building in Lockerbie Square. . . . It should be noted that within an appropriate framework there can be many different design solutions which may be appropriate. While guidelines can create an acceptable framework they cannot insure any particular result and consequently people may hold a wide range of opinions about the resultant designs . . . .
>
> New construction should reflect the design trends and concepts of the period in which it is created. New structures should be in harmony with the old and at the same time be distinguishable from the old so the evolution of Lockerbie Square can be interpreted properly.
>
> * * *
>
> Every site will possess a unique context. This will be comprised of the buildings immediately adjacent, the nearby area (often the surrounding block), a unique subarea within the district, and the district as a whole.

*Id.*, Vol. 13 at 27-28. Clearly, this is an instance where people hold a wide variety of opinions. That the Remonstrators' opinion about this project diverges from the Commission's does not make the Commission's decision unreasonable, however.

[24]    Considering the applicable historic preservation statutes and the historic plan guidelines, and the process by which the Commission made its decision, we

cannot say the Commission acted arbitrarily and capriciously or without regard for the law, abused its discretion, or issued a decision unsupported by the evidence. *See* Ind. Code § 36-7-4-1614(d). The Commission gave due consideration to the pertinent statutory factors and the guidelines in the historic plan when commenting on and requesting changes to the project plans and when ultimately determining the proposal is an appropriate addition to the area.

## B. Zoning Laws

[25] The Remonstrators also claim the Commission's decision violates applicable zoning laws; specifically, they claim the property is supposed to be exclusively residential pursuant to the Comprehensive Plan for Indianapolis and Marion County. The trial court did not speak to this objection in its order, because the Remonstrators did not raise this as an issue before the Commission in their remonstrance letter or before the trial court in their petition for judicial review. It is therefore waived. *See* Ind. Code § 36-7-4-1610.

[26] Notwithstanding the Remonstrators' failure to raise this issue below, there does not appear to be a conflict with the zoning laws. The parcel is currently zoned CBD-2, which "accommodates a diverse mixture of uses including residential, retail, restaurants, entertainment, major public facilities, major convention facilities, sports venues, hotels and memorials." City of Indianapolis-Marion County Consolidated Zoning/Subdivision Ordinance, Sec. 742-106.C.1. The historic plan also recommends the subject real estate be zoned CBD-2. App. of Appellants, Vol. 12 at 45, 50 (with the exception of a quarter block not relevant

here, "[t]he Secondary Area to the west of the HP-1 district is zoned CBD-2, which permits commercial support uses for CBD-1"). And to the extent the historic and comprehensive plans recommend residential use for the parcel, "[r]ecommendations in a comprehensive plan serve to guide subsequent decisionmakers rather than establish present and binding land-use controls." *Fifty Six LLC v. Metro. Dev. Comm'n of Marion Cty.*, 38 N.E.3d 726, 734 (Ind. Ct. App. 2015), *trans. denied*. The Remonstrators have not carried their burden to show the Commission acted in excess of statutory authority or otherwise not in accordance with law when it appears the project falls within the approved zoning for the subject real estate.

## C. Restrictive Covenant[5]

As a condition of the Commission granting a certificate of appropriateness allowing the Athenaeum to demolish the existing structure on the subject real estate, the Athenaeum agreed to the following Restrictive Covenant:

> 1. An issuance of [certificate of appropriateness] . . . shall allow the use of the Subject Real Estate as a parking lot for a period of three (3) years from the date of the issuance ("3 Year Period").

> 2. The Subject Real Estate shall not be used as a parking lot beyond the expiration of the 3 Year Period, unless the

---

[5] The Remonstrators contest the trial court's finding that they did not have standing to raise this issue because the Restrictive Covenant can only be enforced by the Commission and the People's Club. *See* App. of Appellants, Vol. 2 at 23. Because of our resolution of this issue, we need not decide whether the Remonstrators have standing.

Athenaeum shall have applied for and shall have been granted another certificate of appropriateness before the expiration of the 3 Year Period.

3. During the 3 Year Period the Athenaeum shall use reasonable and good faith efforts to support alternative parking solutions for the area within two (3) blocks of [where] the Subject Real Estate is located.

4. In the event that reasonable alternative parking is established within two (2) blocks of the Subject Real Estate before the expiration of the 3 Year Period, then the Athenaeum shall diligently pursue using the Subject Real Estate for residential purposes pursuant to the Plan. The aforesaid diligent pursuit may include, but not be limited to, listing the Subject Real Estate for sale or long-term lease for residential development, contacting developers about residentially developing the Subject Real Estate or seeking proposals for residential development.

5. The provisions set forth in paragraph 2 of this covenant . . . run with and burden the Subject Real Estate.

6. The obligations contained in this covenant including, but not limited to, those in paragraphs 3 and 4, shall be binding upon the Athenaeum's successors and assigns.

App. of Appellants, Vol. 4 at 13-14. The Remonstrators allege the Commission decision should be reversed because the Block 20 project violates this Restrictive Covenant. Specifically, the Remonstrators contend the Restrictive Covenant allowed use of the property for parking of any kind for only three years and thereafter allows only single-family residential use of the property.

[28]     A restrictive covenant is an agreement between a grantor and a grantee in which the grantee agrees to refrain from using property in a particular manner. *Johnson v. Dawson*, 856 N.E.2d 769, 772 (Ind. Ct. App. 2006). One purpose of restrictive covenants is to maintain or enhance the value of land by controlling the nature and use of lands subject to a covenant's provisions. *Id.* Because restrictive covenants are a form of express contract, we apply the same rules of construction applicable to contracts. *Id.* Construction of the terms of a written contract is a question of law for the court and we review the trial court's conclusions de novo. *Id.* Restrictive covenants are strictly construed and all doubts are resolved against restrictions and in favor of the free use of property. *Id.* at 773. With respect to the Restrictive Covenant at issue, the trial court concluded:

> [The Remonstrators'] contention that Block 20 does not comply with the Restrictive Covenant is . . . unavailing, and there was substantial evidence on the record that Block 20 did not violate the Restrictive Covenant. The Restrictive Covenant addresses only the use of an existing surface parking lot on the property; it does not prohibit the use or construction of a parking garage included as part of a larger retail and residential project. Nor does the Restrictive Covenant require exclusive residential use on the property as suggested by [the Remonstrators]. As Block 20 will include sixty-seven (67) residential units in addition to the parking garage, it satisfies any requirement (to the extent such a requirement exists and runs with the land) to have a residential use on the property. It is instructive to this Court that the three parties responsible for drafting and issuing the Restrictive Covenant—the [Commission], the Lockerbie Square Peoples Club, and the Athenaeum—all support the project and do not view it as a violation of the Restrictive Covenant.

App. of Appellants, Vol. 2 at 22-23.

[29] For several reasons, we cannot agree with the Remonstrators' proposed construction of the Restrictive Covenant. First, the current use of the parcel is definitively in violation of the Restrictive Covenant, as the covenant restricted its use as a parking lot to the 3 Year Period which expired in 2004. Although the Restrictive Covenant states its terms run with the land and are binding on the Athenaeum's successors, it is somewhat unclear what the effect of the Restrictive Covenant is at this point. Nevertheless, the Restrictive Covenant does not foreclose use of the property for any parking purpose in perpetuity; rather, it restricted use of the property *solely* as a parking lot beyond the 3 Year Period. Although the Block 20 project incorporates parking—as it is adding residents to the area who will be in need of parking—it is not "a parking lot," which is the restricted use.[6] Moreover, the Restrictive Covenant does not mandate that the property be used for solely residential purposes after the 3 Year Period. In fact, the Restrictive Covenant only references pursuing residential use "*[i]n the event that* reasonable alternative parking is established within two (2) blocks of the Subject Real Estate before the expiration of the 3 Year Period." Appellant's App., Vol. 4 at 13 (emphasis added). As no acceptable alternative parking was established pursuant to the Restrictive

---

[6] The applicable zoning ordinance contains separate definitions of "parking lot" ("A hard-surfaced area . . . intended for the temporary placement of vehicles . . . .") and "parking garage" ("A structure or part of a structure used primarily for the housing, parking, or temporary short-term placement of motor vehicles . . . ."). Ord. Sec. 740-202.P.

Covenant within the 3 Year Period, the obligation to pursue residential options was never triggered.

[30] It seems clear that the purpose of the Restrictive Covenant was to allow the Athenaeum to demolish a building that did not enhance the preservation or character of the historic district and put the property to temporary use while it worked to revitalize the property in a manner that would be a benefit to the district. The Commission's decision to grant the certificate of appropriateness to a mixed use project that includes a parking component did not violate the terms of the Restrictive Covenant.

# Conclusion

[31] The Remonstrators have failed to show the Commission's decision to grant a certificate of appropriateness for the Block 20 project is invalid. The judgment of the trial court is therefore affirmed.

[32] Affirmed.


Crone, J., and Bradford, J., concur.